Wheeler, J.
In reference to the several grounds of error relied on for a reversal of the judgment, considered in the order in which the proceedings to which they relate transpired, we are of opinion—
1. That it was within the discretion of the court under the circumstances to refuse to permit the amended pleas of the defendant Newcomb to be filed. He had obtained leave to amend his pleadings within a prescribed period, one year previous to the filing of these pleas. He had, however, declined to exercise the right accorded to him within the time limited by the order of the court and up the very day of trial. His pleas were of a character and came in under circumstances well calculated to induce the belief that he had designedly delayed filing them in order to surprise and delay the plaintiff in the prosecution of his suit. He did not attempt in any way to account for or excuse-his delay, and there was, we think, no error in rejecting his pleas thus offered *117 more than one year after the cause had been at issue, and upon the very eve of the trial.
The pleas of the defendant Gambel, to which exceptions were sustained, presented in substance the same issue which was presented in his fourth amended plea; and although the former were stricken out, their substance was retained in the latter, and the defendant was allowed the full benefit of the grounds of defense presented by them. They asserted that the plaintiffs were alien enemies; a defense of which the defendants were allowed to avail themselves by every means in their power. In respect to the several rulings of the court upon the pleas, it may be observed that in point of fact no right of the defendants was ultimately prejudiced by these rulings; for they appear to have had accorded to them on the final trial the full benefit of all their pleas, and of every defense set up or attempted to be set up by them. The case, indeed, was tried and the jury were instructed upon the very issues presented by these pleas; and it doubtless was regarded as the right of the defendants thus to avail themselves of their various grounds of defense under the plea of “not guilty.” (8 Stat., 1844, 70, sec. 5.) The rulings of the court in question therefore appear to have become and to have been treated at the trial as wholly immaterial. They were at most mere irregularities, in no way affecting ultimately the merits of the controversy or the rights of the parties, and can afford no ground for reversing the judgment.
2. The argument in support of the defendant’s demurrers, founded on the want of any averment that the plaintiff’s title had been recognized by the laws of this Government, is answered by the opinion of the court in the case of McMullen v. Hodge, (ante.) The views urged respecting the effect of a revolution upon the rights of private property are, it is believed, opposed to the opinion of every distinguished jurist of modern times who has treated of that subject. “ It is a settled principle in the law and usage of nations (says Chancellor Kent) that the inhabitants of a conquered territory change their allegiance, and their relation to their former sovereign is dissolved; but their relation to each other and their rights of property not taken from them by the orders of the conqueror remain undisturbed. The cession or conquest of a territory does not affect the rights of property. Vattel, b. 3, c. 13, sec. 200; The United States v. Perchman, 7 Pet. R., 51; Mitchell v. The United States, 9 Id., 711; Strother v. Lucas, 12 Id., 410, 438. The laws, usages, and municipal regulations in force at the time of the conquest or cession remain in force until changed by the new sovereign. (Calvin’s case., 7 Co., 17; Campbell v. Hall, Cowp. R., 209; 9 Pet. R., 711, 734, 748, 749; Strother v. Lucas, 12 Pet. R., 410.” (1 Kent. Com., 5th edit., 178, n. a.)
We deem it unnecessary to fortify by a further reference to authorities principles of so universal reception, and which seem in themselves so rational and consonant to the spirit of justice and humanity. We are of opinion that it was not necessary for the petition to allege that the grant had been recognized by this Government, and that the demurrers were rightly overruled.
3. The instruction given by the court to the jury on the trial of the issue upon the plea of alien enemy, “that if one of the minor heirs of Sylvester De Leon removed from Mexico to Texas, and had the plaintiff in this suit appointed Ills guardian, it was such a recognition of his rights as a citizen as removed the disability of alien enemy,” if erroneous, was an immaterial error, and one which cannot affect the validity of the judgment.
The evidence touching the status or national character of this plaintiff established that at the (late of the Declaration of Independence, and previous to his birth, his fattier resided with his family in this country; that the father remained at ins residence here until removed by authority of the then Government to the State of Louisiana ; and that the infant plaintiff was born in that State shortly after the removal thither of his *118 parents. That the father, by virtue of his residence here at the date of the Declaration of Independence, became entitled to the privileges of a citizen of the Republic of Texas cannot admit of a question. (Const. Repub., Gen. Prov., sec. 10.) And it is equally certain that he could not lose his citizenship without some voluntary act evincing the intention to renounce it. “ That place is properly the domicile of a person in which his habitation is fixed, without any present intention of removing therefrom.” (Story’s Conf. Laws, sec. 43.) The habitation of Sylvester Do Leon, the father, appears to have been thus fixed in this country at the date of the Declaration of Independence, and it so continued up to the time of his removal under the influence and coercion of a superior and controlling power. His removal and subsequent temporary residence in Louisiana did not effect a change of domicile, for “residence in a place, to produce a change of domicile, must be voluntary. If, therefore, it be by constraint or involuntary, as by banishment, arrest, or imprisonment, the antecedent domicile of the party remains.” (Id., sec. 47.) Again, “a domicile once acquired remains until a new one is acquired.” (Ib., 1 Kent Comm., 76; 2 Kent Comm.. 431, n. a.) “Two things must concur to constitute domicile : first, residence; and secondly, the intention of making it the home of the party. There must be the fact and the intention.” (Story’s Conf. of Laws, sec. 44; 19 Wend., 11.) “A new domicile (says Kent) is not acquired by residence, unless taken up with an intention of abandoning- the former domicile.” (2 Kent Comm., 431, n. a.) In the case of Sylvester De Leon the intention to renounce his domicile in this country and to establish it elsewhere appears to have been wanting. XL; therefore retained his original domicile, although he did not actually reside in this country. For, says Story, “in many cases actual residence is not indispensable to retain a domicile after it is once acquired; hut it is retained, animo solo, by the mere intention not to change it or to adopt another. If, therefore, a person leave his home for temporary purposes, but with an intention to return to it, this change of place is not in law a change of domicile.” (Conf. of Laws, sec. 44.) Whatever may have been the object of the authorities of the then Government in removing Sylvester De Leon and others from their homes in Texas, however humane the motive, It cannot be denied that the effect upon the persons so removed was a temporary banishment from their country and homes. It was such a change of residence as did not effect a change of the national domicile of those persons. Sylvester De Leon does not appear ever to have acquired another domicile elsewhere ; and we have seen that the original domicile remains until a new one shall have been acquired animo et facto. (Id., sec. 44, 47; Story’s Comm. Const., 565; 2 Kent Comm., 230, n.) He does not appear at any time to have manifested an intention to abandon his homo in Texas. On the contrary, he left it involuntarily and with the view of a mere temporary absence, and he persevered until his death in his efforts to regain it. Upon the death of his wife, having placed his infant children with their grandmother in Tamaulipas. lie returned to the place of his former residence in Texas, with the avowed intention of resuming his home, from which he had been expelled; he declared his intention of bringing back his children, and sold property to procure the means necessary to enable him to do so, and he actually entered upon and died in the prosecution of this avowed object. Those events all transpired within about two years from the date of the Declaration of Independence, and there is no evidence of any act of Sylvester De Leon during this time indicative of an intention to abandon his domicile or renounce his citizenship in Texas. He therefore undoubtedly is to be regarded as having retained his domicile and citizenship here until his death. (10 Mass. R., 488 ; 11 La. R., 175; 5 Ves. R., 750, 787 ; 5 Mass. R., 390; 2 Kent Comm., 5th edit., 230, n.)
Such being the status or national character of Sylvester De Leon, what was that of his son Francisco Santiago, the infant plaintiff?
It is stated by Judge Story, in his Conflict of Laws, (sec. 44,) that “ minors are generally deemed incapable, proprio marte, of changing their *119 domicile during their minority, and therefore they retain the domicile of their pareuts; and if the parents change their domicile, that of the infant children follows it; and if the father dies, iris last domicile is that of his infant children.” (Id., sec. 46.) And again, after stating the general rule that “persons who are-born in a country are generally deemed to be citizens and subjects of that country,” the learned commentator adds : “A reasonable qualification of this rule would seem to be that it should not apply to the children of parents who were .in ilimre in the country or who were abiding there for temporary purposes.” (Id., sec. 48.) And although he does not undertake to assert that in the present state of public law such a qualification is universally established, its propriety does not appear to have been questioned; and its adoption in the present case seems to be fully sanctioned by law and demanded by every consideration of .humanity and justice. (2 Kent Comm., 230, n.; 1 Binn. R., 349, 351; 3 Pet. R., 120.)
In this view of the law upon the subject, which seems too rational and well .settled to admit of a question, it is clear that the domicile of the parents drew to it that of their children, as well that of the infant plaintiff born in Louisiana as of his elder brothers who had been removed with their parents from their home in Texas, and hence that he was neither an alien nor an alien enemy.
But if it be denied that the domicile of the infant plaintiff attached to and became that of his parents, then the general rule that persons born in a country are to bo deemed citizens and subjects of that country, must prevail, and that would fix his domicile and citizenship in Louisiana, one of the United States, a Government with which the courts of this country will judicially take notice the Republic of Texas was at peace ; and hence, unless domiciliated of his own volition in the enemy’s country or engaged in commerce there, which is not protended, he could not have been an alien enemy. Since, therefore, there was no evidence which in any aspect of the case could have warranted the jury an finding that the plaintiff was an alien enemy, the instruction upon that point was wholly immaterial, and that an erroneous instruction upon an immaterial or irrelevant point or mere abstract question will not authorize the reversal of a judgment has been repeatedly decided. (Mercer v. Hall, 2 Tex. R., 284; Holman v. Britton, Id., 297; Chandler v. The State, Id., 305.)
4. The instructions asked by the defendants and refused at the same time—that is. on the trial of the issue upon the plea of alien enemy—were, we think, rightly refused. They were inapplicable to the evidence. They assumed the existence of facts not in evidence, and proceeded to raise certain hypotheses upon that assumption. Instructions thus hypothecated upon the assumption of facts not proved were calculated to mislead the jury. In the language of the Supreme Court of the United States in the case of Boardman et al. v. Reed et al., (6 Pet. R., 328,) these instructions “asked the court to presume against the facts of the case, and to found instructions upon the presumption thus raised.” (Id., 344.) And we hold, as was ruled in that ease, that a court is never bound to give instructions in reference to a supposed state of facts when the facts of the case are clear and uncontradicted. (Ib.) Such unquestionably were the facts in evidence in this case in reference to the issue before the jury when the instructions in question were asked.
This dispenses with the necessity of a particular examination of the instructions asked. In order to their entire accuracy as legal propositions, they -evidently required to be understood with certain qualifications. And the court was not bound to give iu charge to the jury propositions which required mod-iilications and qualifications. Unless the proposition as asked is true and pertinent to the case, it is not error in the court to refuse it.
The issue presented to the jury was upon the plea of alien enemy. *120 The question was whether the plaintiffs were persons laboring under the disability incident to that character. And it is perfectly clear that that character and consequent disability did not attach to them.
5. The finding of the jury on the first trial, that Sylvester De Leon and his two children, Martin and Francisco, were aliens, &e., is, we think, a mere nullity. That was not the issue submitted to their trial. The plea asserted that the infant plaintiffs were alien enemies. The precise question for the jury to determine was the truth of this plea, not whether the ancestor of the plaintiffs or themselves were aliens, &c. That it is the duty of the jury to find the very point in issue, to respond to the precise question of fact submitted to their trial by the pleadings, and that their verdict finding a matter which was not in issue can have no legal effect or validity, is perfectly well settled. A verdict must respond to the issue, or no judgment can be rendered on it. (7 Port. K., 218; 2 Dev. R., 537.) “Whether the jury find a general or a special verdict, it is their duty to decide the very point in issue, and although the court in which it is tried may give form to a general finding, so as to make it harmonious with the issue, yet if it appear to the court that the finding is different from the issue, or is confined only to a part of the issue, no judgment can be rendered on the verdict.” (4 How. U. S. R., 131; 2 Wheat., 221.)
In respect to their general rights and disabilities as to real property, it has been said that there is no difference between alien friends and alien enemies,. (7 Cr., 603.) and this is, in general, true. But there may be eases in which their rights and disabilities are widely different; as where, by treaty or statute, aliens are enabled to acquire by descent or purchase, and to hold lands as-citizens, and consequently to maintain any action in respect to them which it would be competent for a citizen to maintain. In such a case the same difference would obtain between alien friends and enemies in respect to their real as in respect to their personal property, The alien friend could sue-while the alien enemy could not, unless residing here, maintain an action in our courts during the war. This distinction has been often adverted to and recognized in judicial decisions. In Jackson v. Decker the Supreme Court of New York, adverting to this distinction, said: “The plea of alienage interposed to suspend a recovery during a war between the two Governments is very different from the plea of alienage which the statute meant to guard against and obviate.” (11 Johns. R.. 418, 422.) The statute here referred towns an act of the Legislature of that State making it lawful for certain aliens to acquire the title to and hold lands, (Ib., 2 Wheat. R., 259; 3 Id., 1; 4 Id., 453.) The plea that the plaintiff is an alien, interposed to a real action or one-for the recovery of land, goes, in general, to defeat the right of action altogether, upon the principle of public policy, which denies the right of an alien, in general, to inherit or hold lauds. (Bac. Ab., Uses and Trusts, E., 2; 1 Id., Aliens, D.; Comy. Dig., tit. Alien, C., 5; 7 Cr., 603; 4 U. S. Cond. R., 347, n.; 1 Pet. C. C. R., 40.) But the plea of alien enemy interposes a defense merely temporary in its nature. The right of action of persons laboring under the disability asserted by the plea is merely suspended during the war. Rights of action of whatever nature, recognized by the laws, and which, existed anterior to the war, are not extinguished, but the remedy is merely suspended. (1 Kent Com., 68; 10 Johns. R., 183; 13 Ves. R., 71; 3 Campb. R., 152.)
Moreover, a person may be an alien and a citizen of the enemy’s country, and yet he will not be deemed to labor under the disability of an alien enemy if he shall have come to reside in this country anterior to the bringing of the suit. (2 Kent Com., 63; 10 Johns. R., 70, 72, 73; 6 Binn. R., 241.) Nor, on the other hand, to impress upon a person the character of an alien enemy, is it necessary that he be an alien. A citizen may acquire a hostile; character by his residence, for commercial purposes, in the enemy’s country, or, without such residence, by simply connecting himself with a commercial house *121 in the enemy’s country in time of war, or by continuing during the war such a connection formed in time of peace. (1 Kent Com., 80.) “A belligerent has a right to consider as enemies all persons who reside in a hostile country, or who maintain commercial establishments there, whether they be by birth neutrals, or allies, or fellow-subjects, subject only to this qualification, that they are enemies sub modo ‘only.’” (Ib.).
It would seem, therefore, that there is a difference between the plea of alien-age and of alien enemy, and that the verdict cannot be regarded, even in substance and effect, as a response to the issue submitted to the jury upon the plea of alien enemy, especially when we consider how that plea is regarded and the rules of construction which are applied to it. “The plea is called in the books an odious plea.” (Per Kent, Ch. J., in Clarke v. Morey, 10 J. R., 72.) And the rule is that “it is not to be favored by intendment.” (Id., 71.) It would not well comport with this view of the character of the plea for the court by intendment to convert it from a plea of alien enemy into one of alien-age in order to favor this “Odious plea,” which the law regards with disfavor and will not aid by intendment.
Moreover the pica was not regarded or treated by the parties at the trial as interposing the defense that the plaintiffs were aliens, and hence incapable of maintaining an action in respect to real property. The court was not asked so to consider it; it was not submitted to the jury as interposing that defense, and now to give it that construction would operate a surprise upon the plaintiff. That defense was pleaded by the defendants, but the trial of the issue upon those pleas was reserved until the final trial. The defendants were then allowed to introduce evidence touching the truth of their pleas, and they were negatived by the verdict of the jury. As to Sylvester De Leon at least nothing can be more perfectly clear than that the verdict was a mere nullity. His character was not drawn in question by the plea. It alleged nothing respecting him, and we put out of view as manifestly unauthorized and nugatory the finding in respect to him.
But whether effect be given to the verdict or not respecting the infant plaintiffs, the result must be the same. It was either a legal finding or it was not. If the former, it supported the right of the infant plaintiff, on whose behalf the-suit was subsequently conducted to judgment; for while it asserted that Martin and Francisco were aliens, it expressly found that their brother, Francisco-Santiago, was a citizen. And if these are to be regarded as legally-established facts, the suit was rightly abated as to those parties plaintiff who were’found to be aliens, and subsequently conducted in the sole right of their brother who was found to be a citizen ; for the law is that “ where a person dies leaving issue, who are aliens, the latter are not deemed his heirs in law, for they have no inheritable blood, and the estate descends to the next of kin who have inheritable blood in the same manner as if no such alien issue were in existence.” (4 Wheat. R., 453; 4 Cond. R., 510, and 2 Bl. Com., 249 ; 4 T. R., 300; Com. Dig., “Alien,” C., 1.)
But if, on the contrary, the verdict was not a legal finding, it did not affect the right of either of the plaintiffs, and the judgment rendered upon it was erroneous only in so far as it gave effect to the finding by abating the suit as to two of the plaintiffs. But this was an error of which the defendants cannot complain. Their rights were in no way prejudiced by it. Nor can they be heard to object that the suit was not permitted to be further prosecuted on behalf of those plaintiffs who, they allege, were alien enemies. By their admissions of record the suit was righly abated as to them, and they are estopped by their own averments from now maintaining the contrary. The only persons who could have complained of the judgment rendered upon this verdict are those plaintiffs as to whom the suit was abated, and they are not before the court and have not been heard to complain. Whether the finding of the jury is to be regarded as a legal verdict or not, it determined no issue against *122 the plaintiff Francisco Santiago, and his right to maintain the action cannot have been affected by it.
6. The title of the plaintiff given in evidence upon the final trial was, it is believed, sufficiently proved, and was admissible in evidence. But it is not necessary authoritatively to determine this question or to notice the objections urged to the title of the plaintiff, for the reason that the defendants were not in a condition to controvert the plaintiff’s title. They had acknowledged it, and had asserted its existence and validity in various ways. The defendants Newcomb and Gambol had expressly admitted it in their answers. The defendant Hardy had asserted it in the Probate Court, and made it the subject of his administration; and the defendant Ingram had purchased and claimed title under it. So also had the defendants Newcomb and Gambel. They had given in evidence and claimed under their several tax titles and administrator’s deeds, which were based upon and recited the plaintiff’s title. Having thus Acknowledged and asserted it in their pleadings and evidence, they could not be permitted afterwards to contest its validity. “If a defendant has acknowledged the title of the plaintiff, he cannot afterwards dispute it.” (1 Caines R., 444; 6 J.R., 34; 7 Id., 157; 19 Id., 202; 2 Johns. Cas., 353; Ad. on Ej., 57, n; 4 Cow., 587, 598; 5 Id., 129, 130; 4 Johns. R., 202; Id., 320.) The principle (it has been said) upon which admissions of a party to the record are evidence against him is that, although a man cannot be a witness for himself, yet “every man is the best possible witness against himself.” (1 Caines R., 444, n.) And although a different principle may have been asserted at the trial, it is conceived that the admissions of each one of these defendants is to he taken as against all. There was a privity of interest between some, if not all, and certainly there was a privity in design between all of them. And although, where there are several parties ro the record on the same side, the admissions of one “are not permitted Co affect the others who may happen to be joined with him unless there is some joint interest or privity iu design between them-.” (1 Greenl. Ev., 3d edit., sec. 174.) Yet it is otherwise whore there is a joint interest or a privity in design. (Ib., n.) In the present case, however, all had acknowledged the plaintiff's title, though in different ways.
Again, it is a general rule of law that “a recital of one deed in another binds the parties and those who claim under them by matters subsequent. Technically speaking, such a recital operates as an estoppel, which works on the interest of the land and binds parties and privies.” (Per Story, J., 6 Pet. R., 611.) “It is not offered as secondary, hut as primary proof; not as presumptive evidence, hut as evidence operating by way of estoppel, which cannot be averred against, and forms a muniment of title.” (Id., 612; 4 Pet. R., 1, 83; 8 East R., 487; Com. Dig., Estoppel, B. C., Evidence. B., 5.) The several deeds under which the defendants claimed title referred to and recited the fact of the grant to the ancestor of the plaintiff, and they were all based upon his admitted title to the land in question. That title, indeed, constituted the sole basis on which the defendants rested all their pretensions and claims of title, as it had been the sole foundation of the sales for taxes and the proceedings in the Probate Court out of which those claims and pretensions arose. The various acknowledgments and admissions of the defendants to which we have adverted wore, we think, conclusive upon them of the genuineness and validity of the plaintiff’s title.
It therefore is unnecessary to examine t.he sufficiency of the evidence adduced by tiie plaintiff in support of his title or the propriety of the ruling of (lie court in rejecting the evidence offered by the defendants to impeach it. For, as remarked by'Mr. Justice Story iu delivering the opinion of the court upon .an analogous question in Carter v. Jackson, (4 Peters, 83.) “whichever way these, points may decided, our opinion proceeds upon a ground which supersedes them and destroys all their influence upon the case.” (Id., 88.) Their discussion, therefore, may be dispensed with.
7. Respecting the ruling of the. court upon instructions asked at the filial trial on the subject of abandonment, the same view is entertained as that *123 already expressed of the refusal of instructions asked at the trial upon the plea of alien enemy. The instructions asked were not authorized by the evidence. There was no evidence which, under any construction that the court might have given, could have warranted the jury in finding the fact of abandonment.. The court therefore could not be required nor was it authorized to assume the existence of that fact and to base instructions upon the assumption.. To have held the removal of the ancestor of the plaintiff from his country and home without his consent and against his will to amount to evidence of the abandonment by him of the country would have been to sanction an utter perversion of facts and a total disregard of the truth and justice of the case. To constitute the abandonment of one’s country there must be the concurrence of the act and the will. It must necessarily include a change of the national domicile. And we have seen that in this case there was no change of domicile. There could not, therefore, have been an abandoment of the country. In De Bonneval v. De Bonneval (Curt. R., 852) it was held that where A quitted Trance in 1702, and resided in England until 1814, and then returned to Trance, and from that time resided occasionally in both countries, he had not thereby abandoned his original domicile. (2 Kent Com., 130, n.) The ■change of residence was not “ complete and total,” in the language of a learned judge. It was not permanent and final; and without sucli a change, of residence there could be. no change of the national domicile of the parly, and by ■consequence no abandonment of the country.
Without dwelling upon the, peculiar circumstances of this case, it is sufficient that there does not appear to have been anything in them which could have warranted the assumption that this party had abandoned the country, and we are of opinion that the instructions based upon that assumption were rightly refused. The ground on which it is proposed to disfranchise a party and to divest his title, to his property ought to be clearly and conclusively established.
8. The instructions given at the instance of the plaintiff were, we think, correct. A person cannot be both buyer and seller at the same time. He cannot act in this double capacity. “The rule (says Chancellor Kent.) is founded on the danger of imposition and the presumption of the existence of fraud, inaccessible to the eye of the court. This principle, (he adds,) like most others, may be subject to some qualification in its application to particular cases; but as a general rule it appears to be well settled in the English and in our American jurisprudence.” (4 Kent Com., 5th edit., 438, n. 6, c.) It therefore was not error to instruct the jury in effect that a purchase made by A sheriff or an administrator at his own sale is deemed fraudulent in law, and that a fraudulent sale is void. Prima facie the sale so made was void, and there do not appear to have been any circumstances in the case requiring the court to consider the qualifications to which the rule may be subject.
It is not necessary to notice the various instructions given at the instance of the defendants. Whatever opinion maybe entertained of their correct ness, as statements of legal principles, having been given as asked by the defendants, they cannot be asaigned by them as error, nor can any errors they may contain afford ground for the reversal of the judgment.
9. Under the prayer for general relief the plaintiff was entitled to a writ of possession, although he had previously stricken out his special prayer for that writ. This he had done evidently tinder the mistaken belief that he was not entitled to that remedy. But this mistake of the party respecting his legal rights ought not to deprive him of the relief appropriate to his case, or of such a final judgment on the merits as the law and facts authorized. Such a judgment, it was competent for the court to render under the prayer for general relief.
The same may be said of the judgment annulling the tax titles. The general verdict for the plaintiff determined every issue in his favor, and consequently every material averment in the petition was maintained by the verdict. The. legal consequence of those averments was that the titles under which the defendants claimed were void; that the plaintiff was the legal owner *124 of the land and entitled to recover of the defendants the possession, and it was-the duty of the court, under the prayer for general relief, to embody those general results in the judgment. They constituted the judgment of the law upon the ascertained facts of the case.
Note 38. — McMullen v. Hodge, ante, 34.
Note 39. — White v. Sabriego, 23 T., 243; Barrett v. Kelly, 31 T., 470.
Note 40. — Under the law of Mexico, persons domiciliated out of the Republic could acquire no right by inheritance to lands of persons dying in Texas. (Yates v. lams, 10 T., 1G8.
Note 41. — Kilpatrick v. Sisneros, 23 T., 113;’ Word v. McKinney, 25 T., 258.
Note 42. — Wells v. Barnett, 7 T,, 584; Smith v. Johnson, 8 T., 418; Cook v. Garza, 9 T., 358; Hamilton v. Rice, 15 T., 382.
Note 43.“-Johnson v. Davis, 7 T., 173.
10. The fact that the pleas and answers of the defendants were all under oath did not make them evidence or render it necessary to overbear them by a greater amount of evidence than would have been requisite had they not been sworn to. The defendants were not required to answer under oath. They were not interrogated as to any matter of fact stated in their answers. The fact that the subject-matter of 'the amended petition was properly the subject of equitable cognizance did not change the rules of procedure applicable alike to all cases in our practice, or require the observance in this case of rules peculiar to a court of chancery. The affidavits of the 'defendants were voluntary; they did not add to or in any respect change the legal effect of their answers. And it is deemed proper to remark that a practice which should sanction the swearing of parties thus unreservedly and indiscrimately to such a mass of discordant and repugnant matters, as it is impossible not to perceive the pleas and answers in this case do present, is to be seriously deprecated and discountenanced. But if the answers were to have the same effect given to them as answers in chancery, the evidence was, it is conceived, sufficient to overbear them. A case of more flagrant wrong and oppression, or one more fully and clearly made out in evidence has, it is believed, seldom been presented in a court of justice. The evidence was, in our opinion, ample in support of «'.very essential averment in the petition, and fully sustains the verdict of the jury. And upon the whole we are of opinion that there is no error in the judgment, and that it be affirmed.
Judgment affirmed.