## KELLY, Widow, *against* HARRISON.

K., a native of Ireland, removed to New York in 1760, where he continued to reside until his death, in 1798. He left a widow in Ireland, at the time he removed from that country, having been married in 1750. His wife was a native of Ireland, having never left the country, but continued a subject of the king of Great Britain. It was held, that the wife of K. being an *alien*, could recover dower of those lands only, of which K. was seised before the American revolution, or the 4th of July, 1776, and not of those he acquired after that period.

The division of an empire works no forfeiture of a right previously acquired.

THIS was an action of *dower*. The cause was tried before Mr. Justice *Radcliff*, on the 18th of November, 1799,

when a verdict was found for the demandant, subject to the opinion of the court, on a case containing the following facts :

The marriage of the demandant, seisin and death of her husband were admitted. The demandant, and her husband, John Kelly, were born in Ireland, where they were married in the year 1750. About the year 1760, John Kelly, came to the city of New York, where he resided at the commencement of and during the American revolution, and continued to reside in the state of New York, until his death, which happened in the autumn of the year 1798. The demandant is a subject of the king of Great Britain [*30] having *continued to reside in Ireland from her birth to the present time.

*B.* *Livingston* and *D. A. Ogden,* for the demandant, cited Plowden, as to alienage, 21, 26, 27, 81, 82, 119. 1 Vent. 417. 1 P. Wms. 127. 7 Co. 54. *Calvin's case,* Kirby's Rep. 413. Bract. 427. Stat. 7 and 10 Anne, Treaty of Peace of 1803, (5 and 6 art.) Treaty of Amity in 1794, (9 art.) Molloy, 238. Goldsb. 29. 5 Co. *Page's case.* Moore, 4. Dyer, 282. 7 Term Rep. 398.

*Troup* and *Harison,* for the defendant, cited 1 Bac. Abr. tit. Alien, (B) and (C).

RADCLIFF, J. It appears that John Kelly was a subject of Great Britain previous to the revolution ; that he resided at that time in the city of New York, and continued to reside in this state until his death, in 1798. His widow, the present demandant, has always resided in Ireland, and continued a British subject. She had, therefore, antecedent to the revolution, a capacity, in the event of her husband's death, to take and demand her dower. The question is, whether by the revolution she is deprived of that right. If the case had been silent as to her continual residence abroad, it might have been presumed that her condition followed that of her husband ; but she is expressly stated to be a British subject, and always to have remained in Ireland. I think the validity of her claim, therefore, depends on the general question, how far the rights of individuals with regard to property, are af-

Kelly v. Harrison.

fected by the revolution. The treaties between the United States and Great Britain do not appear to me to reach this case. The one of 1783, merely forbids all forfeitures and confiscations on either side, and that of 1794, provides, that the subjects and citizens of both nations, *holding lands* in the territories of the other, may *sell, devise* and *dispose* of them at their pleasure, and shall be entitled to all legal remedies, &c. These provisions seem only to relate to rights that are vested and *complete. The in- [*31] terest now claimed was not vested either at the time of the revolution, nor at the date of either of those treaties, and is, therefore, to be considered as independent of them.

In general, the severance, or revolutions of empire, I think, ought not to affect the rights of individuals with regard to property, and it does not appear to me, material, whether that right be contingent or absolute. It is sufficient that it had a commencement or inception, and actually attached to a specific subject. In the present case the demandant by her intermarriage with John Kelly, had, previous to the revolution, acquired a right, eventually, in case of his death, to be endowed of the estate of which he was then seised. The right was thus far acquired, and although dependent on the contingency of her surviving him, she ought not to be deprived of it by the circumstance, that a revolution intervened, before the contingency happened. Until the period of the revolution, she, therefore, had a capacity and a right to be endowed at his death, of the lands of which he was *then* seised, and had been seised during the coverture, and that right must be deemed to continue. I think, however, it ought not to be extended beyond that period, and applied to lands subsequently acquired. At the revolution she became an *alien*, and her husband an American citizen. The independence of this country, by creating a new sovereignty, necessarily had that effect. (Black. Com. 131 ; Co. Lit. 31.) The general principle, therefore, that an alien cannot be endowed seems to be properly applicable to all lands which her husband acquired, in the character of an American citizen. This qualification of her claim will not affect any

right which had actually attached, at the period of the revolution, and such rights only are we bound, by the policy and justice of the case, to maintain. She had it in her power to pursue the condition of her husband, and entitle herself to the like claim in his subsequent estate. Not having done this, she must be deemed to have continued a British subject, and ought from that period to be restricted to her rights as such.

[*32]     *I am, therefore, of opinion, that the demandant is entitled to judgment, in respect to those lands only, of which her husband was seised before the revolution; to wit, on the 4th of July, 1776.

KENT, J. The demandant must be considered as an alien. She was not in fact a resident of the United States, at the declaration of independence,(a) nor do I perceive

(a) An alien is defined to be one who is born out of the ligeance of the king, Com. Dig. tit. Alien, A.; Lit. Sec. 198 ; Wood's Inst. 23 ; 1 Inst. 198, b. ; 1 Wood, 386 ; Calvin's case, 7 Co. 16, a. ; or commonwealth, per Parsons, Ch. J. in Ainslie v. Martin, 9 Mass. R. 454, 459 ; Martin v. Woods, id. 377 ; as for example one born within the British dominions before the American revolution, and who was never in the United States. Principal case. Jackson v. Burns, 3 Binney, 75.' Dawson v. Godfrey, 4 Cranch, 321. Lambert's Lessee v. Paine, 3 id. 97. And see S. C. per Minor, arg. 104–108. The distinctions between the antenati and postnati, in reference to our revolution, have frequently been the subject of judicial discussion. The latter are citizens by a tie too strong to be dissolved without the assent of the government. (United States v. Gillies, Peters' C. C. R. 161. The Same v. Williams, 4 Hall's Am. Law Journal, 361. See 2 Cranch, 82, n. Ainslie v. Martin, cited supra, per Parsons, Ch. J. See also Inglis v. Sailors' Snug Harbor, 3 Peters, 125. Talbot v. Janson, 3 Dallas, 133. See Murray v. The Charming Betsey, 2 Cranch, 120. Murray v. McCarty, 2 Munf. 393. Santissima Trinidad, 7 Wheat. 348, where this question is stated, but not determined. See also 2 Kent's Comm. 43–50, where the question is considered whether the English doctrine of perpetual allegiance applies in its full extent to this country.) But whether the former are so, depends upon their intention to enter into the Commonwealth at the time of its formation, or to avoid it and seek some other allegiance. In Jackson v. White, 20 Johns. 313, Spencer, Ch. J. said :—" We are called upon to discuss and decide this question, as a mere matter of private right, when all the feelings and passions, incident to so mighty a revolution, have subsided. I think it cannot be doubted, that when a people, from a sense of the viciousness of the government under which they have lived, are driven to the necessity of redressing themselves,

Kelly v. Harrison.

that she can be considered a resident, by construction of law. If she had been here previously, and was at the time absent,

by throwing off the allegiance which they owed to that government, and in its stead, erecting a new and independent one of their own, that such of the members of the old government only, will become members of the new, as choose voluntarily to submit to it. Every member of the old government must have the right to decide for himself, whether he will continue with a society which has so fundamentally changed its condition. For, having been incorporated with a society under a form of government which was approved, no one can be required to adhere to that society, when it has materially and radically changed its constitution. Every member submitted to the society as it was, and owed obedience to it, while it remained the same political society. When it divests itself of that quality, by an entire new institution of government, it cuts the knot which united its members, and discharges them from their former obligations. Vat. b. 1, ch. 3, s. 33, and ch. 16, s. 195. Puff. 639. These principles were expounded by Ch. J. M'Kean, in a very satisfactory manner, in *Chapman's case*, 1 Dal. 58. He observed, that in civil wars, every man chooses his party ; but that all the writers agree, that the minority have individually an unrestrainable right to remove with their property into another country ; that a reasonable time for that purpose ought to be allowed ; and, in short, that none are subjects of the adopted government, but those who have freely assented to it. The cases mentioned by the writers on the laws of nature and nations, are not precisely analogous with the condition of the American provinces, at the commencement of our revolutionary contest. Ours was a civil war ; in the event of failure it would have been regarded as a rebellion ; it terminated prosperously and gloriously, and became a revolution. But, that there was an entire dissolution of the government, under which we lived as provinces, owing allegiance to the British crown ; and that a new form of government, and a new organization of the political society took place, cannot be denied ; and hence the case occurred in which every member of the old society had a right to determine upon adhering to his old allegiance, and withdraw himself ; or to abide among us, and thus tacitly, or expressly, yielding his assent to the change, and becoming a member of the new society." And accordingly where a native of Great Britain, a soldier in the British army, deserted from that army during the war of the revolution, and was domiciled in Connecticut at the period of the treaty with Britain by which the independence of the United States was acknowledged ; it was held that, by this treaty, he was released from his allegiance to Britain, and became a citizen of the United States. *Hebron* v. *Colchester*, 5 Day, 169. S. P. *Phipps'* case, 2 Pick. 394, note. So where such native was taken prisoner of war in 1777, and was never exchanged, but, not being confined, he voluntarily fixed his domicil in Massachusetts, where he remained till 1824. *Cummington* v. *Springfield*, 2 Pick. 394. In both these cases, the *animus manendi* existed. And in *Kelham* v. *Ward et al.* 2 Mass. R. 236, and in *Gardner* v. *Ward*, id. 244, n., it was decided that persons born in Massachusetts before the revolu-

*animo redeundi,* or although she had never resided in America, yet if we could collect from the case, that the se-

tion, who had withdrawn to a British province during the war, and had re-turned before the ratification of the treaty of peace, retained their citizenship, notwithstanding their absence while hostilities continued. Their intention to adhere to the American government was in both cases the substantial ground of decision, and it was considered that had the same persons remained in the British province until after the treaty, they would have been British subjects, because they had chosen to continue their former allegiance, there being but one allegiance before the revolution, and that being to the sovereign of Great Britain. It was assumed, that Massachusetts had rightfully taken the rank of a sovereign and independent state, and that she lawfully succeeded to the right of self-government, the sovereignty being in the people as a body poli-tic. All, therefore, who were born within her limits and who had not been expatriated voluntarily or by compulsion, had a right to claim the protection of her laws, and owed allegiance to her as their sovereign. But a British sub-ject not born within Massachusetts, would not have become a citizen from the mere fact that he was here on the ratification of the treaty of peace. Opinion of the judges in *Phipp's case,* 2 Pick. 394. Upon this principle, there-fore, persons born here before the declaration of our independence, who left the country *before that event,* and never returned, are aliens. *Inglis* v. *Trus-tees of Sailors' Snug Harbor,* 3 Peters, 126. Where one came from England to New York, in 1774, at which time he was a major in the British army, and, having been arrested, in 1776, as a person disaffected to the American cause, he was, in August or September, 1776, a prisoner on parole, and re-mained as such at Albany until December or January following, waiting for a passport to join his regiment, when he either joined the British army or went to England, where he died, about 1800, being then a general in the British army; it was held that he continued a British subject. *Jackson* v. *White,* 20 Johns. 313. And a native, who left the province after the commencement of the revolution, and continued with the British until the close of the war, and then went with them to Nova Scotia, where he died in 1790, became thereby an alien. *Palmer* v. *Downer,* 2 Mass. R. 179, note. And also one who was born within the colony of New York, in the year 1760, and removed to Ire-land in 1771, and at the declaration of independence was settled as an inhab-itant within the British dominions, where he remained until 1795, when he returned to America, is an alien. *Hollingsworth* v. *Duane,* Wallace, 51. See also *Shanks* v. *Dupont,* 3 Peters, 242, 246. *McIlvane* v. *Coxe,* 2 Cranch, 280. 4 Id. 209. *Respublica* v. *Chapman,* 1 Dallas, 53. *Inglis* v. *Trustees of Sailors' Snug Harbor,* 3 Peters, 122, 123. As, therefore, citizenship is made to depend upon the choice of the party either to adhere to the old go-vernment or enter into the new, a reasonable time has been allowed within which to make the election. *Inglis* v. *Trustees Sailors' Snug Harbor, supra.* See further 2 Kent's Comm. 40, 41, 54, *et seq.* With regard to the common law right of *antenati,* and who did not become citizens, to take real property,

Kelly v. Harrison.

paration between her and her husband, was intended to be temporary merely, and that, in the year 1776, she really

it is a principle of the common law, that the division of an empire creates no forfeiture of the previously vested rights of property. *Principal case.* Per Story, J. in *Terrett et al.* v. *Taylor et al.* 9 Cranch, 43, 50. *Jackson* v. *Lunn, infra,* vol. 3, p. 109. *Apthorpe* v. *Backus,* Kirby, 407. Kinsey, Ch. J. in *Den* v. *Brown,* 2 Halst. 337. The leading case upon this subject is *Calvin's case,* 7 Co. 16, a., cited by Lansing, Ch. J. and Kent, J. That case was as follows :—Calvin was born in Scotland, after the crowns of England and Scotland were united on the head of James the First. The question was, whether he could maintain an assize of *novel disseisin* of lands in England. The plea was, ' that he was an alien, born at Edinburgh, within the kingdom of Scotland, and within the ligeance of the king of Scotland, and out of the ligeance of the king of England.' One of the objections on the part of the defendants was, that if *postnati* were, by law, legitimated in England, great inconvenience and confusion would follow, if the king's issue should fail, whereby those kingdoms might again be divided. But to this it was answered by the judges, that ' it is less than a dream of a shadow, or a shadow of a dream ; for it hath been often said, natural legitimation respecteth actual obedience to the sovereign at the time of the birth ; for as the *antenati* remain aliens to the crown of England, because they were born when there were several kings of the several kingdoms, and the uniting of the kingdoms by descent subsequent, cannot make him a subject to that crown to which he was an alien at the time of his birth, so albeit the kingdoms (which Almighty God of his infinite goodness and mercy divert) should by descent be divided, and governed by several kings ; yet it was resolved, that all those that were born under one natural obedience, while the realms were united under one sovereign, should remain natural born subjects, and no aliens ; for that naturalization, due and vested by birth-right, cannot, by any separation of the crowns afterward, be taken away ; nor he that was, by judgment of law, a natural subject at the time of his birth, become an alien by such a matter *ex post facto.* And in that case, upon such an accident, our *postnatus* may be *ad fidem utriusque regis,* as Bracton saith, in b. 5, ch. 24, fol. 427.' See 3 Cranch, 106. The right to inherit of course depends upon the question, whether citizen or alien at the time of the descent cast. The British *antenati* have been consequently held to be incapable of taking lands by descent subsequent to our social compact. 2 Kent's Comm. 57. *Reed* v. *Reed,* cited 1 Munf. 225, and opinion of Roane, J. in appendix. *Dawson* v. *Godfrey,* 4 Cranch, 321. *Jackson* v. *Burns,* cited *supra.* *Blight* v. *Rochester,* 7 Wheat. 535. See *Lambert* v. *Paine,* 3 Cranch, 97. In *Den* v. *Brown,* 2 Halst. 305, it was held, that British *antenati* were not subject to the disabilities of aliens, as to the acquisition of lands *bona fide* acquired between the date of our independence and the treaty of peace in 1783, for the issue of the war was then undecided. See *Commonwealth* v. *Bristow,* 6 Call, 60. But in *Hunter* v. *Fairfax's Devisees,* 7 Cranch, 603, and 1 Munf. 218, the line of

Kelly v. Harrison.

meditated a removal here, and afterwards, effected it, or was prevented by inevitable accident, in such cases I might, perhaps, be disposed to consider the residence of her husband, constructively, as her residence. But the case before us will not justify any such intendment. Her husband had left her, six years previous to our independence, and the separation continued until his death, 1798. The inference from these facts must be, that there was a permanent separation, by agreement of the parties, and not being a resident within the United States, in July, 1776, either in fact or in law, nor naturalized since, she is an *alien*.

Being an *alien*, the next point that arises in the case is, how far she can support her claim of dower.

I admit the doctrine to be sound, (*Calvin's case*, 7, Co. 27, *b*. Kirby Rep. 143,) that the division of an empire works no forfeiture of a right, previously acquired, and as a consequence of it, that all the citizens of the United States, who were born prior to our independence, and under the allegiance of the king of Great Britain, would be still entitled in Great Britain to the rights of British subjects. But the rule will not apply, *e converso*, that British subjects have with us the privileges of citizens; and for this evident reason, that the sovereignty of the United States was created by the act [*33] of independence, and *there could be no previous right acquired in respect to it, and conseqently none to lose, nor could it include any persons, other than residents at the time, within its jurisdiction. The revolution, accordingly, left the demandant where she was before, and impaired no right she then enjoyed. She is entitled now to dower in all lands of which she would have been *dowable*, had her husband died at that time. But being an *alien* she cannot since have acquired rights of property which aliens are not permitted to acquire; and to render her dowable of lands pur-

distinction between aliens and citizens was considered to be coeval with our existence as an independent nation; and, therefore, that the British *antenati* could not acquire any other than a defeasible title to lands in Virginia, between the date of our independence and the treaty of peace in 1783. See 2 Kent's Comm. 57, 58.

Kelly v. Harrison.

chased by her husband subsequent to July, 1776, is to vest her with a right not then vested.

By marriage, she was capable of being endowed of lands purchased by her husband at any time during the coverture. But the right could not attach till the land was purchased, and I distinguish between the capacity to acquire and the vested right. The revolution took away the one, and did not impair the other.

I am of opinion, therefore, that if the lands of which dower is now claimed, were owned by the demandant's husband, on the 4th July, 1776, she is entitled to dower; otherwise, not.

BENSON, J. concurred.

LANSING, Ch. J. It has already been stated, that the only question which arises in this cause is, whether the demandant is capable of taking as *tenant in dower ?*

It was admitted in argument, that the demandant, prior to the declaration of independence, had a capacity to take as such.

In determining this question, I do not think it necessary to enter into a minute consideration of the effects which the separation of the United States from Great Britain, had on the situation of the subjects of that crown, inhabiting its dominions, *beyond* those states, as respects their rights *in them,* prior to the revolution.

*I think, however, neither justice, sound sense, nor   [*34]
the just interpretation of the authorities submitted to
our consideration, or such as I have had an opportunity of examining with a view to this question, impose it upon the court to decide on principles analogous to those which influenced the decisions of the English courts in the several stages in which they acquired or lost their continental possessions.

The event most analogous in English history to the separation of the United States from Great Britain, is that of the loss of Normandy. The Normans claimed England by conquest, and, however much it may be affected to be disguised, actually exercised the most rigorous rights derived

from that source ; and though in process of time Normandy became only a secondary object to the successors of William the Conqueror, it might justly be considered, as the superior or ruling state, as long as the rights of sovereignty of both countries were cencentered in the same person.

Their sovereign, however, remained in England.  Upon the separation of those states, it appears from 7 Co. 20, that it was held there, *that all such lands as any Norman had, either by descent or purchase, escheated to the king, for their treason in revolting from their liege lord and sovereign.*  This was on the principle of a rebellion against their feudal chief ; but the dictates of policy must, obviously, have exclusively influenced an opinion so extremely rigorous and unjust, as to define the treason by territorial limits, and to subject the Normans, however diversified their cases might be, *in consequence of their promoting or assisting the separation,* to an indiscriminate loss of property.

This case cannot, therefore, be admitted as of any weight in forming a rule here.

In all the other instances presented in English history, the countries lost or acquired, were merely in right of the crown. The principle is universally admitted in all the authorities, that birth in its locality, is the test of subjection.  A person under the allegiance of that crown, has a community [*35]  of rights as a subject, and owes allegiance *to it as such.   The object to which that allegiance attached continues to exist ; and a new modification of the forms of government, as respected its executive, would not be permitted to vary its application.

But the present case appears under a somewhat different aspect.  The United States formed a portion of the British dominions, but had no constitutional influence on the national will ; the colonies were confessedly subordinate.  Among them were found no objects to which allegiance, as derived from the previously existing government, could attach.  I merely hint at this distinction, as I do not not mean to pursue or give any opinion on it.  It is important, but the manner in which I contemplate the subject, does not lead me to a particular investigation of its tendency.

Kelly v. Harrison.

It is admitted, that the demandant once had a capacity to take. Her husband obtained the right of acquiring and holding real estate in this state, until his death. There is no pretence that the long separation between them, is to be attributed as a fault to her. She must, therefore, in legal intendment, be considered as under the control of her husband. It does not appear that, as to him she has done any act to forfeit her dower. Her residence in Ireland, in legal construction, must have been dictated by her husband; and her domicil, constructively, is that of her husband.(a)

I am, therefore, of opinion, that she is entitled to recover, whether the seisin of her husband of the land of which she claims her dower, was before or after the revolution.

LEWIS, J. was of the same opinion.

> Judgment for the demandant, for dower in lands of which her husband was seised prior to the revolution.

(a) A married woman follows the domicil of her husband. Voet ad Pand. lib. 5, tit. 1, No. 101. *Warrender* v. *Warrender*, 9 Bligh, 89, 103, 104. *Greene* v. *Greene*, 11 Pick. 410. This results from the general principle that a person who is under the power and authority of another, possesses no right to choose a domicil. Encyc. Am. tit. Domicil. Poth. Cout. d'Orleans, c. 1, art. 10. 2 Domat Pub. Law, b. 1, tit. 16, § 3, art. 11, 13. Merlin Repert. Domicil, § 5. *Mulierem quamdiu nupta est, incolam ejusdem civitatis videri, cujus maritus ejus est.* Dig. lib. 50, tit. 1, l. 38, § 3. Id. lib. 5, tit. 1, l. 65. Pothier Pand. lib. 50, tit. 1, No. 24. 2 Domat Pub. Law, b. 1, tit. 15, § 3; art. 12. Voet ad Pand. lib. 5, tit. 1, No. 101. And upon this general principle, minors are generally deemed incapable *proprio marte* of changing their domicil. during their minority, and therefore they retain the domicil of their parents, and if the parents change their domicil, that of the infant children follows it ; and if the father dies, his last domicil is that of the infant children. Dig. lib. 50, tit. 1, l. 9. Pothier Pand. lib. 50, tit. 1, n. 3. Cout. d'Orleans, c. 1, art. 12, 16. 2 Domat Pub. Law, b. 16, tit. 16, § 3, art. 10. *Guier* v. *O'Daniel*, 1 Binney, 349, 351. Voet ad Pand. lib. 5, tit. 1, n. 91, 92, 100. Story on Conflict of Laws, § 46. See also Burge Comm. on For. & Col. Law, vol. 1, p. 32–57. Henry on Foreign Laws, App. A. 181–209. Denizart Dic. art. Domicil. Merlin Rep. art. Domicil. Encyclopedia Moderne, art. Domicil. Encyclop. Americana, tit. Domicil.