ELEAZER KILPATRICK ET AL. V. ROSALIA SISNEROS ET AL.

The civil *status* of all persons residing in Texas at the date of her declaration of independence, was fixed by the constitution of the republic. They, (Africans, and the descendants of Africans and Indians, excepted,) were declared to be citizens, and entitled to all the privileges of such.

Although the constitution also declared, that all persons who should leave the country to evade a participation in the struggle for independence, or refuse to participate in it, or should give aid or assistance to the enemy, should forfeit all rights of citizenship, and such land as they might hold in the republic; yet the adhering to the cause of Mexico, and going there to reside, did not, *ipso facto*, and without any action taken by the government to declare the forfeiture, make them aliens, or vacate their titles, and restore their lands to the mass of public domain.

There is no more firmly settled or universally approved principle of law, than that a revolution works no change in previously vested rights of property, except in so far as the new political society may see proper to declare and effect a change, by a direct exercise of sovereign power.

The owners of land, acquired under the colonization laws, before the separation of Texas from the states of the Mexican çonfederacy, did not, consequently, incur the penalty of a forfeiture of their titles, as prescribed in the 30th article of the state colonization law of the 24th of March, 1825, against those who should establish themselves in a foreign country, by becoming or

remaining domiciled in Mexico, after the dismemberment of the government.

It has been settled by repeated decisions of this court, to be a matter of public history of the country, of which the courts will take judicial notice, that Martin De Leon had authority to colonize within the coast border.

Tax deeds, void upon their face for want of certainty, and falsity of description of the land claimed, are not to be deemed deeds duly registered; and will not support the plea of the statute of limitations of five years. Nor are they evidence of title, or color of title, to sustain the plea of possession for three years, &c.

When a defendant is claiming a *part* of a tract of land, to sustain his defence of the statute, it is incumbent upon him to show that he has had possession of the *land* claimed by him, under his deed, for the space of time required by the statute.

APPEAL from Victoria. Tried below before the Hon. Fielding Jones.

This was an action of trespass to try title, brought by the appellees, Rosalia Sisneros, widow of Juan Nepomicino Agaton Sisneros, Estavan Sisneros, son of said Juan, Eulalia Garza, and her husband Thomas Garza, Maria Guadaloupe Solis, and her husband Louis Solis, (the said Maria and Eulalia being the daughters of the said Juan,) against the appellants, Eleazer Kilpatrick, William C. Blair and Samuel A. White, for the recovery of a certain league of land, granted to the aforesaid Juan Agaton Sisneros, by the commissioner of De Leon's colony, on the 3d day of April, 1835.

The land sued for was described in the petition as situated in Victoria county, on the east side of the Guadaloupe river, commencing at the upper landmark of Jose Maria Rios, at a stake on the bank of the river, from which a forked Cotton-wood, six inches in diameter, bears north 16° west, 3 varas, and a Mulberry, four inches in diameter, bears north 46° west, 1 vara; and thence with the upper line of Rios' survey, to the north 45° east, 10,265 varas, to a stake in the prairie for the second corner; thence north 45° west, 2500 varas, to a stake for the third corner; thence south 45° west, at 7700 varas, struck the margin of a swamp 8924 varas to the bank of one arm of the river, where set a stake for the last corner; from which a White

Oak, thirty inches in diameter, bears north 16° east, 3 varas, and another, five inches in diameter, bears north 68° east, 7 varas; and thence following the meanders of the river to the place of beginning.

The answer of the defendants set up the following defences :—

1. The general issue.

2. That the land described in the plaintiffs' petition was sold by the sheriff of Victoria county, on the 3d day of November, 1841, and that H. Ledbetter and J. H. Beck purchased the same, through whom defendants, by mesne conveyances, became the owners.

3. That the defendants located and re-located the said tract of land as vacant public domain, by valid certificates and warrants, by which they became the owners of the land.

4. Plea of the three years' statute of limitations.

5. Plea of the five years' statute of limitations.

6. That they and their predecessors entered on the premises claimed by plaintiffs' petition, adversely to the plaintiffs, and that the plaintiffs did not enter on the said land within ten years, next after their right of entry accrued.

7. That the plaintiffs broke the conditions of their grant or title, by abandoning the country in the year 1836, and settling in Tamaulipas, one of the states of the Mexican Government.

8. That the title set up by the plaintiffs was a nullity, because made in fraud of law, in this, that the territory in which the land lay, was at no time a part of De Leon's colony, as it purported in said title to be, but that it lay in the ten coast leagues, for which De Leon had no contract with the state or federal government, but was expressly denied the liberty by the governor of the state of Coahuila and Texas, to colonize the same.

Amended answers averred in substance, that the plaintiffs, Estevan and Eulalia, left the republic of Texas in the year 1836, and Rosalia and Maria in the year 1837, during the

struggle for Independence, and went into the government of Mexico, and there remained until the year 1848; whereby they forfeited all rights to citizenship in the late republic of Texas; and that they had not since been naturalized according to the laws of the country, and were now aliens. The amended answer also set up the statute of limitation of ten years.

The plaintiffs demurred generally to the sufficiency of all the several defences, except the general issue.

An amended petition of the plaintiffs, filed by way of replication to the defendants' pleas of the statutes of limitation, alleged, that on the 29th day of March, 1849, there was instituted in the District Court of Victoria county, a suit of trespass to try title, by Rosalia Sisneros, as administratrix of Juan Nepomicino Agaton Sisneros, v. Eleazer Kilpatrick and William C. Blair, and that the subject matter of that suit was the identical land now claimed and sued for in this action; that the said Rosalia, one of the plaintiffs herein, prosecuted the said suit for the benefit of the other heirs, and that the same was determined in the Supreme Court, on the 23d day of February, 1853, in favor of the defendants; (see Blair v. Sisneros, 10 Texas Rep. 34;) and that this suit was brought within one year from the date of the determination of said suit.

On the trial, the exceptions of the plaintiffs to the fourth, sixth, and seventh answers, and to the amendments, alleging abandonment and alienage, were sustained.

The plaintiffs, it was admitted, were the heirs of the grantee, Juan Nepomicino Agaton Sisneros, and the original grant from F. De Leon, commissioner of De Leon's colony, to the said ancestor, Agaton Sisneros, with a translation thereof, was read in evidence: this grant described the land, purporting to be thereby conveyed, by the same description and boundaries as set forth in the petition of the plaintiffs.

The defendants offered to read, in evidence, a certified copy from the records of the District Court of Victoria county, of the return made by the sheriff of the said county of defaulting tax payers for the year 1839, from which it appeared that "Rosia

Sirgneares" was a defaulter in the amount of $133.32, and that an execution was issued by the clerk of said court, on the 9th of June, 1841, to said sheriff, against said "Rosa Sirgneares," for said sum of $133.32, due from her for taxes, as aforesaid. This execution was levied on the 12th of July, 1841, by the sheriff, as was shown by his return " on one league of land, situated about fifteen miles below the town of Victoria, on the east side of the Guadaloupe river," and was returned satisfied on the 8th of September, 1841; but by whom, or whether any disposition had been made of the land levied upon, did not appear from the said return.

The defendants, however, in connection therewith, offered in evidence, a deed by the said sheriff, to Hamilton Ledbetter and Joseph H. Beck, executed on the 8th day of September, 1841, which recited that the said sheriff had levied the said execution on a league of land, as the property of said "Rosia Sizinoris," widow of "N. Sizenoris," "known as the *Sizenoris* league, situate in the county of Victoria, on the east bank of the Guadaloupe river, about fifteen miles below the town of Victoria, and bounded as follows, to wit, on the southwest, partly by the Guadaloupe river, and partly by an island chute of said river, on the northwest by E. Galvaris' league, and on the southeast by a league of land known as J. M$^a$ Rios' league, the same having been granted to N. Sixenaris, as a colonist, by the Mexican government."

· Also a certified copy of an execution issued by the said clerk, to the said sheriff, on the 14th of September, 1841, against "N. Sixenoris," as a defaulting tax payer, for the year 1840, for the sum of $177.12, which, on the 15th of the said month, was levied on "one league of land, about twelve miles below the town of Victoria, on the east side of the river;" and the sheriff's return, which showed that it was "satisfied in full, by Joseph H. Beck and Hamilton Ledbetter, taking and paying for four thousand acres of land, to be taken off the upper part of the league of land levied on."

Also a certified copy of delinquent tax payers for the year 1840, as returned by the said sheriff, from which it appeared, that

"N. Sixenoris" was indebted to the republic of Texas to the amount of $177.12 for his taxes for said year.

The defendants also offered in evidence, a deed executed on the 3rd day of November, 1841, by the said sheriff, to the said Hamilton Ledbetter and Joseph H. Beck, from which it appeared, that the said sheriff, after, as recited in the deed, having given due notice of the time and place of sale, on the first Tuesday in November, 1841, sold at public outcry, at the court house of said county, to said Ledbetter and Beck, for an amount (named in the deed) sufficient to satisfy said execution, the following land, as described in said deed, viz. : "four thousand acres of land, about twelve or fifteen miles below the town of Victoria, on the east bank of the Gaudaloupe river, in the county of Victoria, it being a portion of a league of land granted to the said *N. Sizenoris*, as a colonist, by the Mexican government, and known as the *Sizenoris* league, commencing at the upper corner of said league, on an island chute of said river, running down said chute, with its meanders, to its junction with said river, twenty-three hundred and seventy-five and a half varas from the beginning, it being a lawful front, thence back on said league for complement."

The plaintiff objected to the said instrument being received in evidence, because, 1st, The lists, which were the foundation of the said executions, did not show that their ancestor, or either of themselves, were delinquent tax payers. 2d, Said executions were not issued against their ancestor, or either of themselves, nor against the land sued for, but the first was against *Rosia Sergneares*, and the second against *N. Sixenoris*. 3d, There was a variance between the said lists and executions. 4th, That the said deeds, in connection with the said executions and delinquent lists, as well as upon their face, were void, and that the said deeds did not constitute color of title. 5th, That the property pretended to be conveyed was not the land in controversy. 6th, That the first of the said deeds had not been duly registered. (Having been proven for registry by a party

who was not a subscribing witness thereto.)   These objections were sustained, and all of the said testimony was excluded.

The defendents then offered in evidence, regular chains of mesne conveyances, from which it appeared, that the defendant Kilpatrick became the purchaser, under Beck, of the lower half of the said league, purchased by the said Ledbetter and Beck, at the said tax sale, by deeds duly recorded in Victoria county, on the 21st of April, 1845; but there was no description of the land conveyed to him, except by reference to the said sheriff's deeds.   From the recital in the deeds from Beck, it appeared, that he and Ledbetter had divided the said land, and that Beck got the lower half, and Ledbetter the upper half of the league.

The defendants also offered a deed from Ledbetter to the defendant Blair, for the upper half of said league, but this deed had not been recorded, and was ruled out by the court, upon the same objection as previously taken to the sheriff's deed previously offered and rejected.

The defendants then proved that Kilpatrick and Ledbetter went upon the league of land sued for, in 1842, and each commenced making improvements, but in a short time abandoned the same, on account, as they said, of the troubles occasioned in that section of the country, by the invasion by the Mexicans under General Wool, during the fall of that year.   That Kilpatrick moved a second time, in the spring or summer of 1846 or 1847, upon the league, and "commenced improving his present farm;" but upon what part of the league this was situated, was not shown by the testimony; and had worked there from that time until the trial, except one year that he hired at Green lake; "but, that somebody had been living on the land," the witness said, "ever since he knew it, up to the present time."

The defendants also proved by a witness, who stated that he was acquainted with the surveys in the county, that he knew the corners of the league described in the plaintiffs' title, and that the defendants, Kilpatrick and White, lived upon the same; and then offered so much of the said deeds that had been previously excluded, as described the land intended to be conveyed,

for the purpose of showing its identity with the land claimed by the plaintiffs, and described in the defendants' other deeds. They then proved by the same witness, that the land claimed by the plaintiffs, and that described in the first of the sheriff's deeds, was the same, and that in the second, a part thereof; but that beginning and running the lines, by course and distance, and with the meanders of the said island chute, as directed in the said deed, there would only be included about one-half of the said league.

There was in the record, a full and voluminous statement of the parol and documentary evidence offered by the parties respectively, to fix the boundaries of De Leon's colony; but the view taken of this question by the court renders a statement of it unnecessary.

*S. A. White,* for the appellants.—We will first call the attention of the court to the right of plaintiffs to recover: and first, as to the capacity of an alien to maintain an action to recover real property; and were the plaintiffs aliens under the circumstances set forth in the plea, viz: two of them leaving with the Mexican army in 1836, the other two in 1837. (As to the right of an alien to sue for real estate, see 1 Bacon, Abr., Alien D.; also, 10 Id. Uses and Trusts, E., page 132; Fairfax v. Hunter, 7 Cranch, Rep. 619, 620; Shanks v. Dupont, 3 Peters, Rep. 247, 248; Thomas' Coke, 73, or Coke Lit. 129 b; see also page 88.)

The second branch of defendant's plea of alienage is this, did the Sisneros, by leaving the country as stated in the plea, viz: some of them in the year 1836, with the Mexican army, the others in 1837, and living in Mexico till 1848, fix on them the *status* of aliens? In answer to this, we rely on the case of Inglis v. Sailor's Snug Harbor, 3 Peters, 120–127; also the Constitution of the Republic, General Provision, Art. 8, where, in addition to the right of election taught in the above decision, the citizenship is expressly forfeited.

If plaintiffs should be inclined to take a distinction in this case to the one cited from 3 Peters, on the ground that these

plaintiffs returned to their allegiance in 1848, they might find an answer, by reference to the argument of Mr. Justice STORY, in the case of Shanks v. Dupont, 3 Peters, 247 ; but a sufficient answer may be found in the fact, that the articles of annexation only made citizens of Texas at that time, citizens of the United States ; and made no provisions for those that might return to their allegiance. So that, if they were not citizens in 1836, while they were in Mexico, they are not now, nor will be, until they obtain letters under the laws.

The second point to be considered in the plaintiffs' right to recover, is the breach of the condition of the grant, by leaving the country in 1836. This, after the decision of the Holliman and Peeble's case, would only need to be stated to be decided, were it not that a distinction might be taken as to the country they went to, and the time of leaving. The court below seemed to be of that opinion, and founded it on a supposed opinion of this court, which we have either not seen or not understood.

These plaintiffs left after the declaration of Texas independence, viz : in 1836–37. They went to Mexico. Was the condition of the grant abrogated by the Texas revolution ? This question is answered by the first section of the Schedule of the Constitution of the Republic : "All laws now in force, &c., shall remain," &c. ; again the 21st section of the Land Laws of 1836, (Hart. Dig. Art. 1802;) again, Act of 14th December, 1837, § 24, (Hart. Dig. Art. 1860.) Hence, it is clear, that the condition of remaining in the country was not cancelled, but expressly retained ; and the defendants' plea should not have been stricken out, unless it was vicious, for the second point proposed for consideration, viz : the going to Mexico. This point presents so little of common sense, that we only propose it, because the court below seemed to attach some importance to it. It would be absurd to say, that when the republic adopted the laws then in force, that she did it with a view to all Mexico, with whose policy and interests she had nothing to do ; but she adopted them and adapted them to her own territory, and bounded their operation to the boundaries of the republic ; and this

is the legitimate conclusion; for the reason that the laws of nations and universal custom, do not permit one nation to legislate for another.

The third point taken by defendants, against the plaintiffs' right to recover on the strength of their own title, is, that the commissioner, or grantor, had no authority over the territory in which the grant is made.

This plea of the defendants was overruled by the court below, on the ground that the question had been settled by this court, in the case of Bissel v. Port Lavaca, and sanctioned in the case of De Leon v. White. Had these decisions been on legal principles, they would have been considered binding and conclusive, as well by the defendants as the plaintiffs; but we contend that they were only a finding of facts on the evidence then before the court, and are no more conclusive, than any other acts between other persons; and that the facts there found are contradicted by the evidence in this case. The well settled doctrine of this court, that the consent of the general government was necessary to a grant within the coast leagues, makes it unnecessary to allude to the law on that point; and we think that it may be assumed, that when a commissioner made a grant, not only without, but contrary to the express prohibition of the state government, it would be void. But as the court, in the instructions given for the plaintiffs, took away the question of fact from the jury, we submit that it was error, and if necessary, the cause should be sent back for that reason alone.

The view of the court below, as to the 15th and 16th sections, was erroneous. It seems, the court held, that color of title under the 15th section, should be a fair, equitable title, and therefore a chain of title in which a previous link was a tax title, could not become color, as the subsequent purchaser would have notice, either constructive or actual. Were this true, the 15th section would be a nullity, for such titles need no aid from statutes of limitation, nor could they receive any, as such are a sufficient defence. With this view of the law, the court ruled out the defendants' plea of three years' limitation; and it seems, that it

was by some sort of prevoyance, that the court discovered the character of the defendants'· title, for the plea was ruled out on the plaintiffs' exceptions, before the title came before the court.

But the defendants contend, that the court erred in defining color of title, on more general principles. It appears to us, that the best authorities on that subject agree, that any claim of right which would justify that which would be otherwise a trespass, would be color of title. Then, what is trespass? It is an entry with force and arms. It is said, that, to distinguish between this and a peaceable or lawful entry, the quality of the force, and not the quantity, is to be considered. Then, if one enters on land knowing that he has no pretence of right of ownership, although in the night and by stealth, arms will be inferred, and trespass *quare clausum fregit* would lie. But if he had such title as to induce the reasonable belief that he was the owner, his entry would be peaceable; and ejectment would be the only remedy.

It seems to us, that a tax title, without intentional fraud, in the hands of the first purchaser, would be color of title; for the reason that the purchaser paid the consideration which the law required, and received his deed from the person appointed by the state to convey, and the purchaser pays ·his money under the apparent guarantees of law. This, we think, should be sufficient to raise in his mind a reasonable belief that he was the owner, and an entry under it without opposition, would be an entry without arms, and such a possession, as would protect the owner from an action of trespass *quare clausum*. If so, it is such color of title as will be protected by òur statute. How much more would it give color to subsequent purchasers for valuable consideration, buying of persons peaceably in possession, and having occupied for a long time. It seems to us, that if this is not color of title, the law is only a trick.

The ruling of the court on the plea of five years' limitation, is also assigned for error. It seems, that the court understood that the 16th section would only aid void titles in the hands of an innocent purchaser, without notice; were it so, it would only aid

an equitable title, or at least color of title, which is better aided by the 15th section.

We would ask the attention of this court, also, to the ruling of the court below, as to the 14th section of the statute of limitations; and not only because we consider the defendants' sixth plea in the original answer good, but also because it has, as yet, received no construction by this court; and the court below seemed to found its ruling on some allusions of the chief justice to it, in the case of Horton v. Crawford, 10 Texas Rep. 382. Certainly, the words in which it is expressed, are not very clear, but at the same time, one could hardly be at a loss as to the intention of the legislature. The right of entry there certainly refers to one out of possession; but a person having title, is in possession, either actual or constructive, until ousted by an actual disseisor. While they are thus in possession, they have no cause to enter; but if such are disseised or ousted of their possession, they then have the right to enter, and then the 14th section is called into play. If this is the proper construction of this section, there was no good reason why the court should strike it out. The defendants were entitled to any advantage it might afford them, which, under the view the court took of the defendants' title, would have been great; for it appears to act on the mere *laches* of the plaintiffs, without any reference to the defendants' title. The character of the occupation might also be different from the occupation required as a bar in the 15th and 16th sections; these require a continuous *possessio pedis*—in that, any occupation which would be adverse to the entry or possession of the plaintiffs, would meet the requirements of the 14th section.

*F. S. Stockdale & J. J. Holt*, for the appellees.

WHEELER, C. J.—The special defences pleaded and relied on are: 1st, That the plaintiffs are aliens, and incapable of maintaining this action; and that they forfeited their title by leaving the republic and settling in Tamaulipas, in 1836 and 1837, and the land became vacant. 2d, That Martin De Leon had no

authority to colonize within the coast leagues, and the grant being for land within the coast border, was void. 3d, The statute of limitations of three, five, and ten years.

First, as respects the plea of alienage and abandonment of the country. The plaintiffs were residing in Texas at the date of the declaration of independence, (the 2d of March, 1836,) but afterwards went west of the Rio Grande, some of them in 1836, and others in 1837, and did not return to the state until 1847 or 1848. Did they thereby become, and are they to be deemed aliens to this government? We think not. They may have forfeited their right of citizenship and their title to their lands, but until the forfeiture has been ascertained and adjudged by some proceeding, to be authorized by law for that purpose, their civil *status* is not changed, nor their rights of property divested. This is the doctrine which has been uniformly maintained by the decisions of this court upon this subject, and it is believed to be in accordance with the settled doctrine of other courts in similar cases. (Hardy v. De Leon, 5 Texas Rep. 211; McIlvaine v. Coxe's Lessee, 4 Cranch, Rep. 209; Swift v. Herrera, 9 Texas Rep. 263; Jones v. Montes, 15 Texas Rep. 351; Jones v. McMasters, 20 Howard, Rep. 8.)

In the case of Hardy v. De Leon, (5 Texas Rep. 211,) this court decided, that the constitution of the Republic, (General Prov. § 10,) fixed the civil *status* of all persons residing here at the date of the declaration of independence, by declaring that " All persons (Africans, and the descendants of Africans and Indians excepted) who were residing in Texas, on the day of the declaration of independence, shall be considered citizens of the Republic, and entitled to all the privileges of such." This accords with the doctrine maintained by the Supreme Court of the United States. Thus, in McIlvaine v. Coxe's Lessee, (4 Cranch, 209,) where a person, born in New Jersey before the year 1775, remained there until 1777, and then joined the British army, and ever after adhered to the British, claiming to be a British subject, and demanding and receiving compensation from that government for his loyalty and sacrifices as a refugee—because

he was residing in New Jersey on the 4th of October, 1776, when the state had declared herself a sovereign state, and the laws declared all persons residing there, at the time, citizens, and required their allegiance—the court held that, notwithstanding his subsequent conduct, in adhering to the enemy, in violation of the laws, which denounced forfeitures against him, he was not an alien, but must be deemed a citizen of New Jersey, and as such, entitled to take by descent, lands in that state. Residing in the state when her sovereignty was declared, and remaining there until after she had passed laws by which he was declared a member of, and in allegiance to the new government, his civil *status* was fixed by the law of the state, and his citizenship was not affected by his subsequent conduct. His title to real estate remained vested in him, until the state, by its laws, saw proper to declare it forfeited for his political offences. The laws of the state governments, were the laws of sovereign states; and no doubt was entertained, that the person whose *status* was in question, lost his right of election by remaining there until after the 4th of October, 1776; that he thereby became a member of the new society, entitled to the protection of its government, and owing to it his allegiance.

This decision was expressly approved by the same court in the case of Inglis v. The Sailor's Snug Harbor, 3 Peters, Rep. 99 ; and more recently in White v. Burnley, 20 How. Rep. 250. In the former it was said : "The court in that case recognized fully the right of election, but considered that Mr. Coxe had lost that right by remaining in the state of New Jersey, not only after she had declared herself a sovereign state, but after she had passed laws by which she pronounced him to be a member of, and in allegiance to, the new government. (Id. 124.) Because he was residing there, the law of the state fixed his *status*, by declaring who were to be members of the new government; and being thus fixed, it remained unchanged in the contemplation of her laws, until the state should see proper to declare it changed. (Terrett v. Taylor, 9 Cranch, 50; Kelly v.

Harrison, 2 Johns. Ca. 29, and note; Jackson · v. Lunn, 3 Id. 109 ; and see Ainslee v. Martin, 9 Mass. 454.)

So, the constitution of the Republic, fixed the *status* of those who were residing here at the date of the declaration of independence. They were declared to be citizens. It is to be observed, that there was no declaratory act of the United States thus determining the right of election ; and hence the American rule is, to refer to the date of our independence, as the era at which the American *antenati* ceased to be subjects of Great Britain ; while the English rule is, to take the date of the treaty of peace of 1783. Her doctrine is, that by the treaty of peace, Great Britain and the United States became respectively entitled, as against each other, to the allegiance of all persons who were at the time adhering to the governments respectively ; and that those persons became aliens to the government to which they did not adhere. This is held to be the meaning of the treaty of 1783. (2 Kent, 59, 60, 61). But in Coxe's case, the law of New Jersey determined this right of election, and fixed his citizenship, as to that state, before the treaty ; and he was consequently a citizen of New Jersey by force of her laws. So did the constitution of the Republic fix the *status* of the plaintiffs in this case, by declaring them citizens.

The constitution also declared what should work a forfeiture of citizenship, and the title to lands, thus : "All persons who shall leave the country for the purpose of evading a participation in the present struggle, or shall refuse to participate in it, or shall give aid or assistance to the present enemy, shall forfeit all rights of citizenship, and such lands as they may hold in the Republic." (Ib. sec. 8.) The terms of the provision leave no room to doubt, that the denunciation of forfeiture, was directed against those who should adhere to the Mexican cause, in the then struggle for independence ; but, until the forfeiture was incurred and adjudged, all who were residing here, at the date of the declaration of independence, were, in the language of the constitution, to "be considered citizens of the Republic, and entitled to all the privileges of such." Adhering to the cause

of Mexico, and going there to reside, did not, *ipso facto*, and without any action taken to declare the forfeiture by the government, make them aliens, or vacate their titles, and restore their land to the mass of vacant domain.    This is the conclusion to which the established general principles of the law upon this subject, inevitably lead.    It is the sound and prevailing doctrine in other courts; and it is the doctrine which the decisions of this court, have uniformly maintained.    And this disposes of the questions of alienage and forfeiture, in this case.

But great reliance seems to be placed upon the defence of abandonment of the country, as it is called, by the plaintiffs; and it may be thought that this question deserves a distinct consideration.    It is insisted, that this case is within the principle of the case of Holliman v. Peebles, 1 Texas Rep. 673.  The defence, as presented by the original and amended answer, is, that the plaintiffs "broke the condition of their grant or title, by abandoning the country in the year 1836, and settling in Tamaulipas, one of the Mexican United States."    "Estevan and Eliza, in the year 1836; Rosalia and Maria, in the year 1837, during the struggle for the independence of Texas, went on the other side of the Rio Grande, into the government of Mexico, and remained in the said government of Mexico, until 1848, by which they elected to be citizens of Mexico, and aliens to Texas, and by which leaving, and aiding the enemy, they forfeited all right of citizenship in the republic of Texas; and that the said Sisneros, plaintiffs in the above entitled cause, have not since been naturalized, according to the laws of the country, and are now aliens," &c.    This, it will be seen, is substantially the same defence, in so far as concerns this question, which was pleaded in the case of Swift v. Herrera, 9 Texas Rep. 263. On motion, the plea was stricken out by the court below, as presenting no defence to the action, and this court affirmed the judgment.

In Paul v. Perez, 7 Texas Rep. 338, the title of the defendant was assailed, on the ground of abandonment of the country; and the case of Holliman v. Peebles was cited and relied on as

an authority for holding that the land had become vacant when the plaintiff obtained his survey and patent. It was admitted that the defendant left in 1836, and resided in the town of Rio Grande, on the west side of the Rio Grande River, from 1836, until his return in 1847. The District Court sustained the title of the defendant, and gave judgment in his favor, notwithstanding the plaintiff had, in the meantime, obtained a patent for the land; and this court affirmed the judgment. The question was distinctly proposed and considered by the court, whether the defendant's right had been so forfeited as to re-annex the land to the public domain; and it was decided that it had not. It is plainly to be seen from this case, though imperfectly reported, that if the having removed from Texas into Mexico, and having taken up a residence there in 1836, would have vacated the title on the doctrine of Holliman v. Peebles, this case must have been decided differently.

So in Bissell v. Haynes, 9 Texas Rep. 556, the plaintiff averred that Sanches, the grantee of the title under which the defendants claimed, abandoned the country in 1836, and went beyond the Rio Grande with the enemy, where he died; other proof was, that he left Texas in 1835 or 1836, and went to Metamoras with the Mexicans, when they retreated from Texas; and it did not appear that he ever returned. The District Court sustained the defendants' title, and this court affirmed the judgment.

Again, in the case of Jones v. Montes, 15 Texas Rep. 351, the same ground was relied on as vacating the title of Montes. The case had been fully argued by able counsel, and had been held under advisement for several terms, on account of another question involved in its decision, on which the court had not formed a decisive opinion. In disposing of the case, Judge LIPSCOMB said : " We have regarded every point presented to our consideration in this case, as settled by previous decisions of this court, excepting the single one, that the title extended to Montes does not appear to be upon paper of the proper stamp." And after disposing of that question, he proceeds briefly to notice the

present ground of objection to the title, thus: "It is said that Montes has lost his right of citizenship, by going off to Mexico at the time the Mexicans, under General Wool, retreated. * * * In this case, it is not pretended, but that Montes was a citizen at the date of the declaration of independence ; and all the right he then had to the land in controversy was secured to him ; and if he left under circumstances that, in the opinion of this court would forfeit his citizenship, the facts by which such onerous penalties were incurred, would have to be tried by a due course of law." And after quoting from the constitution of the Republic, and distinguishing the case from that of Casanovas' administratrix, the judge concludes, by saying that, in that suit, Montes "was defending his rights to property acquired before the declaration of independence ; and as he acquired citizenship under the government of Texas, he had a right to its enjoyment, until deprived of it by due course of law."

These references will suffice to show, that it has been settled by repeated decisions of this court, that removing from the Republic of Texas into Mexico did not, *ipso facto*, vacate the title of the owner to his lands, acquired under the colonization laws.

There is no more firmly settled or universally approved principle of law, than that a revolution works no change in previously vested rights of property. Upon the division of an empire, the rights of private property remain precisely in the same condition as before, unaffected by the political division of the empire ; except in so far as the new political society may see proper to declare and effect a change, by a direct exercise of sovereign power. Revolution in itself works no change. Property is held by the same right, and upon precisely the same terms and conditions, under the new as under the former government. The rights of the owner are neither enlarged nor diminished by the change of government.

In Calvin's case, 7 Co. 1, 27, it was resolved by the decision of all the judges, that if the kingdom should be divided, and governed by different kings, " yet all those who were born under one natural obedience while the realms were united, would re-

main natural born subjects, and not become aliens by such mat-
tor *ex post facto*," and that the division of an empire worked
no forfeiture of previously vested rights of property. The doc-
trine is said to have been laid down at a much earlier period
by Bracton ; and in Apthorp v. Backus, Kirby's Rep. 413, it
received the assent of the judges, who say that "it would be
against right, that a division of a state or kingdom should work
a forfeiture of property previously acquired under its laws."
This is the acknowledged doctrine of the American courts. In
Den v. Brown, 2 Halst. 337, the court say : " The obvious in-
ference from this doctrine is, that if a British subject, born an-
tecedent to the declaration of independence, while America and
England were under the authority of the same government, and
owed allegiance to one monarch, was considered as a natural
born subject of that crown, and entitled, in every part of his
dominions, to the rights and immunities which belonged to that
character, nothing has occurred subsequent to that period, which
can deprive him of those privileges. Is there any statute law
or adjudged case, which shows him to have forfeited, or in any
manner lost them? Lord Coke, and all the judges in Calvin's
case say, that he cannot be deprived of them by any matter
*ex post facto*." (2 Johns. Cas. 29; 3 Id. 109 ; 9 Cranch,
40 ; United States v. Percheman, 7 Pet. Rep. 86, 87 ; Jones v.
M'Masters, 20 Howard, Rep. 20 ; White v. Burnley, Id. 250 ;
M'Mullen v. Hodge, 5 Texas Rep. 34 ; 2 Kent, Com. 56, 57.)

It is upon this principle, that the titles to lands acquired
under the colonization laws, before the separation of Texas from
the states of the Mexican confederacy, are not affected by the
revolution and change of government, nor by the owner becom-
ing or remaining domiciled in Mexico, after the dismemberment
of the empire. The thirtieth article of the state colonization
law of the 24th of March, 1825, relied on as working the for-
feiture, declares that: " New settlers, who shall resolve to leave
the state, and establish themselves in a foreign country, shall be
at liberty to do so with all their property, but after thus leav-
ing, they shall no longer hold their land ; and should they not

have previously disposed of the same, or should not the aliena-
tion be in conformity to Art. 27, it shall become entirely
vacant.'' (1 White's Land Laws of California, Oregon, and
Texas, 438; Holliman v. Peebles, 1 Texas Rep. 673.) Thus the
condition upon which, by the law of the grant, the land was to be-
come vacant, was that the colonist should have established him-
self in a foreign country ; that is, of course, a country foreign
to the Republic of Mexico. This was the condition annexed to
the grant, by the law of the contract between the government
and the grantee. The law entered into and formed a part of the
contract, and bound the government to respect the title of the
grantee, so long as he remained domiciled within the Republic
of Mexico. If he did no act violative of the contract, as it
existed at the time of its execution, his grant could not be de-
clared forfeited, and the land vacant. The condition of the
grant, and the rights of the grantee, were unaffected by the
revolution, except in so far as the new government saw proper
to change them. After the revolution, as before, the title was
held under and by virtue of the colonization law, subject to the
conditions annexed by that law, at the date of its emanation;
unchanged in its terms and import. The duties and obligations
imposed by the law upon the grantee, remained as before. The
revolution left his rights precisely as it found them, except in
so far as the new government saw proper to change them. The
only change which was made, was to dispense with some of the
conditions of the grant, leaving that imposed by the thirtieth
article of the colonization law, untouched. It was declared
simply not repealed, by the law which dispensed with other con-
ditions. (Hart. Dig. Art. 1860, p. 1802.) Of consequence, it
remained in its original force, with its original signification, ex-
tent, and operation. It imposed upon the grantee the same
obligation and duty after the revolution as before, and none
other or greater. Such is the conclusion to be deduced from the
acknowledged doctrine, that the rights of private property are
unaffected by the change of government and allegiance effected
by revolution.

This doctrine was considered in its application to the land titles of this country, and expounded with great clearness and force, by Judge LIPSCOMB, in McMullen v. Hodge, 5 Texas Rep. 34. "In the case of conquest," he said, "it is undoubtedly true, that it is in the power of the conqueror to destroy all the rights of the conquered; but in doing so, the most flagrant outrage would be done to the moral sense of the age, and such as would never be presumed to have been perpetrated, without the most positive and explicit affirmation of its author." So, in the case of a change of government by the people by their delegates in convention, " It would be in the power of such convention to take away or destroy individual rights; but such an intention would never be presumed; and to give effect to a design so unjust and unreasonable, would require the support of the most direct and explicit affirmative declaration of such intent." It would be difficult, he said, to conceive, on any known principles of reason or justice, why a change made by the people themselves, (as in the case of the revolution of 1836,) should subject their rights to different and harsher rules of construction, than those which had been applied in the case of a cession of territory. (Ib. 72, 73.)

The convention that framed the constitution of the Republic, retained " in full force, until declared void, repealed or altered, or expired by their own limitation," all laws then in force not inconsistent with the new constitution. (Sched. sec. 1.) But while they made no change in the existing laws under which the colonists held their lands, they imposed other conditions upon the holders of land titles within the Republic, with reference to the new order of things, and the new political relation we sustained towards the government and people of Mexico. Thus, as we have seen, they declared citizens, and asserted a claim to the allegiance, of all persons residing here at the date of the declaration of independence; and they denounced a forfeiture of citizenship and the title to their lands, against all who should leave the country, to evade a participation in the struggle for independence, or who should give aid or assistance to the enemy.

But they did not see proper to declare any change in the laws under which they held their grants, or to enlarge or restrict the terms of these conditions. They might have declared that all persons holding lands within the Republic, who were residing in Mexico, or who should go there to reside, should no longer hold their lands, and that they should become thereby vacant. But they did not so declare. It is said, that the policy of the government requires that this construction be given to the effect of the revolution. But it was for the political department of the government, in the exercise of the law-making power, to declare its policy; and it is for the courts to follow the lead of the political authority upon such a subject, and pronounce the law as we find it. It may have been thought the better policy in the new government, to hold over the Mexican population, who might be supposed likely to take sides with the enemy, the terror of the forfeiture denounced in the constitution, but at the same time, not to remove all motive to their return to their allegiance, by declaring their land vacant, by the mere fact of their having gone to the west of the Rio Grande. Whatever may have been the policy which dictated the action of the government, it did not see proper to declare any change in existing rights of property. The intention to produce such effect by the change of government, cannot be presumed. In the language of the court, in McMullen v. Hodge, to produce such effect would require an affirmative declaration of such intention.

Such, it is believed, is the view which has been always heretofore taken of this question. If it had been supposed, that the going to Mexico worked a forfeiture under the colonization laws, the able counsel who argued the cases of Paul v. Perez, Swift v. Herrera, Bissell v. Haynes, Jones v. Montes, and other cases where the situation of the parties had been similar, would certainly have pressed the argument with sufficient earnestness, to have elicited a full and direct expression of opinion by the court. Such is believed not to have been the understanding of those who framed the constitution and laws of the republic; or of the bench and bar concerned in the exposition of them. It

is certainly contrary to the opinion of the court expressed in its solemn judgments, in the cases to which reference has been made. The decisions of this court, where that question was involved, have all proceeded upon the contrary doctrine to that now contended for by the appellants. And to admit such a doctrine, at this day, would unsettle titles, supposed to have been settled by the repeated decisions of the court, to an unknown *extent*, and work incalculable mischief. It would destroy the confidence and security, which, after years of vexatious litigation, retarding the settlement and prosperity of the country, is at length coming to be felt in the titles to land; and it would be violative of well established general principles of the law upon this subject.

It was objected at the trial, and is insisted in argument, that Martin De Leon had no authority to colonize within the coast border; and that the plaintiffs' grant is consequently void. This question has been settled by repeated decisions of this court; which hold it a matter of the public history of the country, of which the courts will take notice judicially, that De Leon had such authority. If it had not been so determined, the evidence in this case would place it beyond doubt, that his right was recognized and upheld by the authorities of the government, and admitted or acquiesced in by the party in whom it is now claimed the right was, in such a manner as to conclude all further discussion. But there was no necessity for the production of evidence upon that subject, as the question had been put at rest by the decisions. (Bissell v. Haynes, 9 Texas Rep. 556; De Leon v. White, Id. 598; White v. Burnley, 20 How. 235, 246.)

It remains to consider the defence of the statute of limitations. It is clear, that the defendants were not protected by the limitation of three years, under the fifteenth section of the statute, (Dig. Art. 2391,) for the reason, that they produced no evidence of title or color of title, as defined in that section. (Smith v. Power, *supra*, 29; Wofford v. McKinna, *supra*, 36.) The possession of neither defendant is connected by the evidence with the

possession taken by the purchasers at the tax sale in 1842, under any claim or color of title. The possession of the defendant Kilpatrick, dates its commencement, under claim of title, in 1844; that of Blair in 1847 or 1848. This suit was commenced in 1853. Neither defendant, therefore, had a possession continued for a sufficient length of time to claim the protection of the ten years' limitation prescribed by the statute. The defendant, Kilpatrick, relied on the plea of five years' possession, claiming under deeds duly registered, under the provision of the sixteenth section of the statute. (Dig. Art. 2392.) The deeds under which he claimed were recorded in 1845, more than five years before the institution of the present suit; but they did not contain any description of the land in question. If the owner, seeing the defendant in possession of the land, had consulted the record, he would not have been apprised thereby, that the defendant was claiming under these deeds. The description was false in some respects, and so imperfect in others, as to be calculated rather to mislead, than to put the owner upon inquiry, such as would lead to the discovery that the party in possession was claiming the land under these deeds. The falsity of description ran through the tax deeds and all the mesne conveyances; and was such, there being no other circumstance of identity or certainty in the description of the land, as naturally to induce the supposition, upon inspection, that they did not embrace the land in question. The object of the statute, in prescribing registry of the deed, as necessary to enable the possessor to avail himself of the five years' limitation, is, to give notice to the owner that the defendant in possession is claiming under the deed. And if there is such falsity, or uncertainty of description, as that it will not answer the purpose intended, it cannot be considered a deed duly registered, within the meaning of the statute.

But for other reasons, it is clear, the defence of limitation cannot avail this defendant. He failed to prove a continued possession for five years after the registration of his deeds. His possession was interrupted for one year after 1847. The witness

says somebody had been living on the land; but there is no evidence to connect the possession of that person with the defendant. Moreover, there is no evidence that the defendant was in possession of that part of the league claimed by him under his deeds. The possession, to avail the defendant under the statute, must have been a possession of the land claimed by him under his deeds, continued for the space of time required by the statute. The evidence does not show such a possession.

The tax deeds were void upon their face, for the want of certainty, and the falsity of description of the land, and are not to be deemed deeds duly registered within the provision of the law. (Wofford v. M'Kinna, *supra*, 36.)

The defendants manifestly failed to make out their defence of limitation of three, ten, or of five years, under the statute. In arriving at this conclusion, we have considered the filing of the petition in this case as the commencement of the suit, leaving out of view the former suit by one of these plaintiffs, as administratrix, for the recovery of the land. It is unnecessary, therefore, to inquire, whether the plaintiffs can claim the benefit of that suit as an interruption of the statute; and the ruling of the court upon that subject is therefore immaterial. The defendants wholly failed to make out their defence in any view of the question. We are of opinion that there is no error in the judgment, and it is affirmed.

Judgment affirmed.