ADELICIA ACKLIN (CHEATHAM) ET AL. V. F. L. PASCHAL ET AL.

48   147
86   687

1. PRACTICE—LEGATEE CANNOT MAINTAIN TRESPASS TO TRY TITLE.—In an action of trespass to try title, instituted by heirs against parties holding adversely to the estate of their ancestors, a legatee entitled to a moneyed legacy, and not seeking to subject the land to sale, cannot intervene and recover the land.

2. FORCED HEIRS.—In such proceedings, parties cannot litigate their rights as forced heirs as against the provisions of a will duly probated, under which incidents to the property in litigation have attached. A direct attack against the will would be necessary by those claiming rights under the law of forced heirship existing at the death of the testator.

3. FOREIGN JUDGMENTS—PROBATE OF WILLS.—The action of a court of another State annulling a will duly probated in this State, could not affect the status of property of the testator situate in Texas.

4. OWNERSHIP UNDER WILLS.—See facts held sufficient to vest the beneficial ownership to lands in Texas in a corporation, so as to affect the estate therein by the acts or laches of the corporation respecting such lands, in favor of those holding adversely to it.

5. LAPSED LEGACIES—RIGHTS OF HEIRS.—Upon the dissolution of a corporation to which lands were devised, the lands revert to the heirs of the testator, and the party taking holds subject to the debts, if any, of the corporation, and subject to such defenses as existed against the corporation at the time of its dissolution.

6. LIMITATION OF FIVE YEARS.—A deed for an undivided interest in a tract of land will not, under the five years' statute of limitation, protect the grantee beyond the interest it purports to convey.

7. LIMITATION—POSSESSION.—Upon a partition in which improvements occupied and held are allotted to one of the parties to the partition, the possession is thereby limited to the partition including such tenements.

8. PAYMENT OF TAXES.—A certificate by the tax collector of the county where land is situate, that no taxes are charged against said lands on his books, is not sufficient evidence of payment of taxes.

9. JOINT JUDGMENT.—Where several parties defendants have distinct defenses, and go to trial jointly, and there is a joint verdict in their favor, error as to one affects the entire judgment; a reversal as to one, reverses as to all.

ERROR from Bexar. Tried below before the Hon. G. H. Noonan.

[This case was transferred to Tyler, and decided November 16, 1877.]

The plaintiff, Adelicia Acklin, joined by her husband, instituted this suit in the District Court of Bexar county on the 31st of October, 1856, by filing an ordinary petition in trespass to try title, claiming to be the owner of a front of 166 varas of land on Solidad street, in the city of San Antonio, running for depth to the San Antonio river.

In a subsequent amended petition, filed March 14, 1858, plaintiff claims an undivided half of the land described in the petition, asking a division and a partition.

On March 15, 1858, Joseph H. Acklin and William H. Acklin, both minors, intervened by their next friend, Joseph D. Wade, alleging that they have an interest in the property sued for, " by virtue of their heirship from Emma Franklin, deceased, who was their half-sister," and praying for such portion as they may be entitled to under the statutes of descent and distribution of this State.

There is no contest between Mrs. Acklin and her two sons. The claim set up by these plaintiffs (except a separate claim of Mrs. Acklin, now Cheatham) accrues by inheritance from the deceased children of Isaac Franklin, also deceased; or, to explain more definitely in this connection, Isaac Franklin had four children, viz., Victoria, who was born March 27, 1840; Adelicia, born May 13, 1842; Julius Cæsar, born January 24, 1844; Emma, born December 5, 1844,—all being dead, and having died subsequent to the death of their father; that is to say, Victoria died June 10, 1846; Adelicia died May 13, 1846; Julius Cæsar died on the day of his birth, or the day after; Emma died November 1, 1855. Thus, under the laws of this State, Mrs. Acklin, with Adelicia and Emma, became the heirs of Victoria at her death; while at the death of Adelicia, Mrs. Acklin and Emma became her heirs; and at the death of Emma, November 1, 1855, her interest was inherited by her mother and her two brothers of the half-blood, to wit, Joseph H. and William H. Acklin.

The defendants, in their answer, plead the general issue and the statute of limitations of five years. They also set up that the property in controversy was bequeathed by Isaac Franklin to trustees, for the purpose of establishing an institution of learning, to be called the "Isaac Franklin Institute"; that said institute was duly chartered by the Legislature of Tennessee. Defendants further pleaded possession, in good faith, for one year prior to the institution of the suit, and claimed the value of their improvements respectively.

At this stage of the case, there was a trial, which resulted in a verdict and judgment for the plaintiffs, which was brought to this court by writ of error, and there "reversed, and the cause remanded for further proceedings, in accordance with the opinion of this court." (Paschal v. Acklin, 27 Tex., 173.)

While these proceedings were in progress, the "Isaac Franklin Institute" instituted an action of trespass to try title for the same property, which was, after the reversal of the former decision, consolidated with the suit of the original and present plaintiffs. The Franklin Institute having also been, in 1867, dissolved by the Supreme Court of Tennessee, W. B. Leigh, its attorney up to that time, made application for, and received the appointment of, receiver ad litem, to prosecute, as such, the suit for the benefit of the creditors of the institute.

The plaintiff, Mrs. Acklin, on April 6, 1870, filed an amended petition, suggesting the death of her husband, Acklin, and her subsequent intermarriage with Dr. W. A. Cheatham, who asked to be made a co-plaintiff with her. In this petition, Mrs. Cheatham claimed, that of the $100,000 bequeathed to and accepted by her under the will of Isaac Franklin, referred to in defendants' amended answer, there was still due her a large amount, approximating, with the interest accrued, the sum of $150,000; claiming that said unpaid legacy is the prior charge and lien upon the remaining property of her deceased husband's estate; that the remaining property of the estate is greatly inadequate to the payment of the amount due, and

that she is solely entitled to, or interested in, the remaining property, according to the terms of the will. She further claimed, that if the property involved in this suit ever passed to, or vested in, the Franklin Institute, which she denies, it passed to, and vested in, said institute subject to, and in trust for, the payment of her legacy; that said institute was never established or had any legal existence; that by reason of the large expenditures in the management of the estate, the endeavor to establish the institute, as well as by reason of the great destruction of personal property and improvements upon the realty, diminution of its value by the ravages of the late war, the emancipation of the slaves, the utter want of means to establish the institute, the bequests to the same have become and are of no force and effect, and void; that the said institute has become defunct, and has been so adjudged and dissolved by the Supreme Court of Tennessee.

Mrs. Cheatham charged further, that the defendants in this case hold as tenants in common with her, and that their claim to the whole of the property is fraudulent; that they took possession with full notice of the one-half interest of Franklin's estate. Hence she prays for a partition and for general relief.

A portion of this amended petition was, on demurrer of the Methodist Church, one of the defendants, struck out by the court below; and this ruling forms one of the assignments of error.

For answer, the defendants reiterated their former pleas of the statute of limitations, good faith and improvements, and, further, that Mrs. Cheatham is estopped from setting up her legacy, because she accepted the same when the estate had ample means to pay it; that the decree dissolving the institute cannot affect these defendants, for the reason that they were not parties to the proceedings. They also averred the establishment of the institute, denying liability because of its failure, and asserted that the property in controversy could not revert to plaintiffs, or vest in the heirs of the testator,

because no such provision is made by the will.　They denied tenancy in common, and claimed to hold in their own rights, against the claims of all other persons.　Defendants further claimed reimbursement for one-half of the value of their improvements, before they can be ejected; that they have expended $100,000 for "houses, fences, walls, wells, trees, shrubbery, and other improvements."

To the claim of Mrs. Cheatham, defendants pleaded the statute of limitations of two and four years, and, in case of recovery, judgment for the value of their improvements, or for one-half of the value of their improvements, and for the increased value of the land by reason of their improvements.

Plaintiffs thereupon filed a second amended petition, alleging the non-existence of the Franklin Institute; that the bequests made to them and other legatees have priority to the bequest over the institute; that they are entitled to the land in controversy, as claimed in their former petitions; that if said institute ever had any existence in fact or in law, the same has failed and become defunct, and has been so adjudged by a court of competent jurisdiction.

A transcript of the proceedings in the Supreme Court of Tennessee, and of the decree dissolving the Franklin Institute, was attached to the amended petitions, duly certified as the law requires, the decree of dissolution being passed on the 8th of March, 1867.

During the proceedings, up to the time of the last trial, some of the defendants had died, and some of the property had changed hands.　New parties were, therefore, made, and the heirs and legal representatives of those who are dead were also brought in.　Special guardians were appointed for minors.

The two original intervenors, Joseph H. and William H. Acklin, having arrived at the age of majority, they are no longer prosecuting their claims through their next friend, but in their own rights.

The parties properly before the court were: Mrs. Adelicia

Cheatham, joined by her husband, W. A. Cheatham; Joseph H. Acklin and William H. Acklin, original intervenors; the receiver for the Franklin Institute, W. B. Leigh, by virtue of consolidation; the defendants, F. L. Paschal, and the heirs of Mrs. Paschal, deceased, John Fries, the trustees of the Methodist Church, George H. Sweet, Mrs. Susan Dashiell, Miss Harriet Richardson, Thomas G. Williams, and F. D. Faville.

The facts, about which there is no dispute, are as follows:

On the 5th of July, 1837, Pleasant Branch Cocke conveyed to Isaac Franklin, in the city of New Orleans, among other property, the undivided one-half of the property in controversy, being, as before stated, 166 varas front on the east side of Solidad street, and running for depth to the river, in the city of San Antonio, being the fifth parcel of land in the deed of conveyance. This deed was duly filed for record in the county of Bexar, on the 30th day of August, 1844, and forms the basis of the claim for plaintiffs.

On the trial, plaintiffs also introduced a deed from P. B. Cocke to R. R. Barrow, dated March 12, 1839, and another deed from R. R. Barrow to F. L. Paschal, dated ——, 1851, for the purpose of showing that plaintiffs and defendants deraign title from the same source. The first of these two deeds conveys to Barrow one-fourth part of the land in controversy, reciting that one undivided half of the same had been previously sold to Isaac Franklin. The other is a quitclaim deed, and conveys to Franklin L. Paschal all the right, title, and interest of Barrow in and to the same land, reciting that it was acquired from P. B. Cocke. Both deeds are recorded in Bexar county.

After his purchase from Barrow, F. L. Paschal divided the entire parcel of land into five lots, which were by him conveyed as follows:

Two lots to Kampmann & Fries, on May 12, 1852.

One lot to Methodist Church, September 1, 1852.

One lot to R. T. Crigler, July 29, 1852, Paschal retaining one lot for himself.

Under these conveyances, the present defendants claim, some of them having subsequently purchased from the original vendees of Paschal. The subsequent deeds were read in evidence.

The Franklin Institute (that is, the receiver, W. B. Leigh) claims under the will of Isaac Franklin, dated May 24, 1841.

The additional evidence, under the statutes of limitation, will be understood from the opinion.

The testimony as to payment of taxes by defendant Williams is as follows:

Williams, one of defendants, testified: "I live on part of the land in controversy. All I know about the payment of taxes on my property is from a certificate of the sheriff that no taxes are due on it."

The certificate received is as follows:

"SHERIFF AND COLLECTOR'S OFFICE,
"SAN ANTONIO, *February* 5, 1872.

"This is to certify that no State and county taxes are due on property owned by Mr. T. G. Williams, up to date, as per records in this office.

"H. D. BONNET, *Sheriff of Bexar county.*
"By P. HANEISON, *Deputy.*"

The plaintiffs introduced the deputy-sheriff, Haneison, who testified: "I made this certificate as to Williams' taxes. It only means that there does not appear on our delinquent lists anything due from Williams for taxes since 1869. There is nothing in our office showing that the taxes previous to that time were paid. We have no record in regard to it."

This statement is taken substantially from the brief of plaintiff in error.

*Waelder & Upson*, for plaintiffs in error.

I. The court erred in striking out that part of plaintiffs' petition in which Mrs. Cheatham claims the unpaid balance

of her legacy to be a charge upon the remaining property of Isaac Franklin; that said balance is a lien thereon, and that the property in controversy is subject to such lien, and that she is entitled to the same by reason thereof.

Under the will of Franklin, she was entitled to $6,000 per annum, or $100,000 as a legacy, according to her choice, in lieu of dower. This legacy she accepted, and elected to take the $100,000, to be paid in the manner stated in the will; and this amount would draw interest from the 8th of May, 1849, the date of her marriage to Acklin.

That this legacy was a charge upon the estate, and that it was to be first paid in preference to all other legacies, will scarcely be questioned; at least, the authorities to sustain the proposition are abundant.

Provisions in lieu of dower must be paid in full, with interest, even where other legacies have to abate. (2 Redf. on Wills, 749, 750; Id., 363, 2d ed.)

When a legacy is given to a widow in lieu of dower, she takes as a purchaser for a valuable consideration, and is entitled to be paid in preference to legatees who are mere volunteers. (Hubbard v. Hubbard, 6 Metcalf, (Mass.,) 50; Pollard v. Pollard, 1 Allen, 490.)

A widow was entitled to an annuity, secured by bond, in bar of dower. "By the decree, the arrears were to be made good to her out of the personal estate, and in aid of that the real estate was charged." (Tew v. Earl of Winterton, 1 Ves. Jr., 451.)

In Pennsylvania, every bequest to a wife is conditional by force of the statute, which declares that every legacy to her shall be in lieu of dower, if the contrary is not expressed; she is, therefore, to be considered, in such case, as a purchaser, not a volunteer. A testator, after giving his wife certain bank stock and the one-half of the residue of his personal estate, devised to his brothers all his real estate, charged with a certain annuity to his wife, and with gross sums to his other brothers and sisters. The real estate was sold after the

death of the testator, upon an execution against the legatees, and the proceeds were insufficient to pay the legacies charged upon it. İt was held that the annuity to the widow was to be paid in full, and was not to abate with the other legacies. (Reed v. Reed, 9 Watts, 263.)

A bequest in lieu of dower, accepted by the widow, is in effect a purchase thereof, and will not abate with other legacies, upon a deficiency of assets. (Isenhart v. Brown, 1 Edw. Ch., 411.)

A legacy given to the wife of the testator, in lieu of dower, does not abate ratably with other legacies, upon a deficiency of the fund. (Williamson v. Williamson, 6 Paige Ch., 298.)

II. It is objected, that whatever may be due on her legacy, she cannot recover the property in controversy. Perhaps not. But that equitable as well as legal claims may be determined in the same suit, will not be disputed. If, therefore, she cannot recover the property,—but if, at the same time, her claim to her legacy may be set up in this suit, the legacy constituting a lien, it would then be in the power of the court to enforce the lien, and decree sale of the property to the extent of Franklin's interest in the same, directing the proceeds of such sale to be paid to her. It is true, there is no specific prayer to that effect; but it seems to us, that under the prayer for general relief, it is in the power of the court, under our system, to give every relief the litigant may be entitled to.

Nor could the defendants object to this course, for the reason that if they are not entitled to more than half of the land, it is perfectly immaterial what disposition is made of the other half. As to the Franklin Institute, we need simply to say, that if the view above taken is correct, as we contend it is, then the claim of Mrs. Cheatham is prior and superior to any claim which the institute could have, though we maintain that it never had any.

In this connection, we may also refer, in support of our proposition, to the very phraseology of Franklin's will, which

gives seizure of the estate to his executors; and they were to hold possession for the following purposes, in the order designated by the instrument:

1. To pay debts.

2. To place his wife in possession of all property given to or inherited by her from her father, &c.

3. To provide for the support and education of his children.

4. To place his wife and children in possession of the Fairvue place.

5. Payment of legacy or annuity to his wife in case of second marriage.

6. In case of second marriage, to take possession of the Fairvue place.

7. Improvement of Louisiana plantations until his children are all of age or marry, when the executors shall deliver up property in Louisiana, for the purpose of division between the children and trustees appointed to establish the Franklin Institute.

8. The placing of slaves.

9. The payment of other legacies.

10. The building of a family tomb.

11. To place the trustees in full possession, at the times designated, of all his property in the States of Tennessee and Mississippi, or any other common-law State where trust estates can be created; and of one-third, one-half, or two-thirds, as the case may be, of all movable property, &c.

It would seem from all this, that the payment of the legacy to the wife was, in the mind of the testator, a condition precedent, and that it was to be paid before any of his property should pass into the hands of the trustees.

For these reasons, we submit, that the exception to the ruling of the court upon this branch of the case was well taken. And these same provisions must also have their effect in other branches of the case, particularly in that which relates to the claim of the Franklin Institute, as set up by the

receiver, as well as the defendants, who seek to vest the property in the institute first, and then attempt to make good their title by means of the statute of limitations, when, in truth and in fact, under the provisions of the will, the institute could not obtain possession of or acquire any right in the property until after compliance with the first six directions, and after all the children of the testator had attained the age of majority or had married, for that is the only time designated, and the time when the establishment of the Franklin Institute was contemplated. Nor does the incorporation of the institute, and the proceedings looking to its going into active operation before that time, change or modify the provisions of the will, or give the trustees a greater right in the property bequeathed to them than the terms of the will in other respects warrant.

III. We submit, that by the terms of the will the property in controversy could not, under any circumstances, have passed to or vested in the Franklin Institute until after Franklin's children had become of age or had married, and until the legacy to his widow was paid. If Emma, the last of the children, had lived, she could not have reached the age of majority until after it had become obvious that the institute would fail for want of means, and she would not have been much beyond that age when the institution was dissolved by the decree of the Supreme Court of Tennessee. The legacy to Mrs. Cheatham was never paid, as we have before said, and as is abundantly shown by the evidence in this case.

Now, if it be said that when it became a fact that no child could ever arrive at full age, the property might have been divided between the heirs of the several children and the trustees, provided always that the legacy had also been paid, then this proposition is met by the fact that no division was made; that the trustees never took possession of or attempted to claim the property, and that this condition of things remained until they were discharged by decree, and the institute was thereby dissolved; that nothing could vest until

the prior conditions of the will were complied with; and that the non-compliance remains to this day. Nor did the fee to the property ever vest in the institute, for other reasons that we shall hereafter bring to the notice of the court.

IV. The next section of the charge seems to us clearly erroneous. If we comprehend its import, it means that a testator might dispose of all his property in this State, if it did not exceed in value one-fourth of his entire estate, wherever situated, without reference to the disposition of property elsewhere. Or, to illustrate by the case at bar, Isaac Franklin might have given all his property in Louisiana, Tennessee, and Mississippi to the Franklin Institute; yet the courts of this State would take no notice of that, but allow him to disinherit his children as to property in this State, provided it did not exceed in value one-fourth of his estate. We cannot so read the opinion of Mr. Justice Moore, which the district judge no doubt intended to follow. We submit, that this part of the charge is radically wrong; that it was calculated to mislead the jury; and that it is such error as should work a reversal of the judgment.

Such is not the law of forced heirship, according to the provisions of our former statute, as we understand it. We also beg leave to differ from the opinion of this court in 27 Texas, though we approach this branch of the case with much hesitancy, it being always a disagreeable and often an unprofitable task to hold opinions at variance with those entertained by a court of last resort. We hope, however, that the court will bear with us, when we venture to suggest our own views upon this subject. The court say, on page 195, that "the object of the law was to secure to children a just and reasonable proportion of their parents' estate. If they received the portion to which they were entitled, it is immaterial where or in what they received it." Can this be so to the full extent as enunciated? As to realty, is it not the *lex loci rei sitæ* that governs in such cases? And may not this law vary in different States or countries? And should not the law be enforced

according to the rule adopted in the country where the real estate is situated?

Does not every country adopt its own rules in matters of this character, and must not those rules be the guide of adjudication within its territorial limits? For instance, a testator owning real estate in two or more different States may, and must, if at all, dispose of that situated in one State according to the laws of that State, and dispose of that situated in another State according to the laws of such other State. And if all States in which such testator owns lands have laws of forced heirship, then he must, to make his will valid in each State, pay due regard to such laws of forced heirship in each State. Thus, it might happen that in one State the testator is authorized to devise away from his children his entire estate, while in another he might not be permitted to devise away any. And it seems to us, that whenever the courts of any one State are called upon to give construction to the will of a testator, they should give their construction in accordance with the laws of their own State, without reference to what may be the law in any other, and without reference to any property of the same testator in any other State.

For authority upon this point, we refer to Redfield on Wills, vol. 1, pages 397, 398, where it is laid down that "the descent of real estate, as well as the devise of it, are governed exclusively by the *lex rei sitæ*. It would not comport with the dignity, the independence, or the security of any independent State or nation, that these incidents should be liable to be affected in any manner by the legislation, or the decision of the courts, of any State or nation beside itself."

A will of fixed or immovable property is governed by the *lex loci rei sitæ*. As to personal property, the *lex domicilii* governs. (1 Jarmon on Wills, 1, 2, 3.)

That "a party will not be permitted to take under, and at the same time adversely to, a will," is unquestionably true, as a general rule. But, like every other rule, it has its excep-

tions. Thus, one may accept one provision of a will, and reject another wholly distinct.    (2 Redf., 741, 747, 751.)

And the doctrine of election and satisfaction does not preclude a party from accepting, through another, property or estate which such person obtains in opposition to the will. (Redf., part 2, 749.)

Upon the same reasoning, may not the same devisee take property under the provisions of the will in one State, the devise being made in accordance with the laws of such State, and also take in opposition to the will in another State whose laws have been disregarded by the testator?    Although we have no direct authority to offer in support of this last proposition, except the general principle that the *lex rei sitæ* must govern, yet it seems to us that there is no good reason to the contrary of the proposition.

This case, as now presented by the record, is, however, materially different in this respect from the case as formerly brought up; and if the court should now hold to the former ruling upon the question under discussion, then we say that Isaac Franklin, by his will, devised away from his children more than one-fourth of his entire estate, and that they (the children and their heirs) never did receive three-fourths of that estate.

This court decided in this case, on the former occasion, in effect, that the children of Isaac Franklin were entitled to three-fourths of the estate of their father, wherever the same might be situated, and in whatever kind of property it might have been received or bequeathed.    We asked the court below to submit that issue to the jury in clear and distinct terms.    It was one of the vital questions in the case, and should have been submitted.    The court refused to submit it, and in refusing committed error fatal to the judgment as rendered.

V. For the same reason, the court erred in refusing to give that part of the charges asked which would have brought the question of reversion as a clear and distinct issue before the

jury. It is true, the general charge seems to concede the proposition of plaintiffs on that point; but we contend that we were entitled to more than a mere concession by implication.

That plaintiffs, if they are the heirs of the deceased Franklin, are entitled to all property of the estate which has not been expended or disposed of, by right of reversion, can hardly be a question, we think.

A reversion is the returning of land into the possession of the donor or his heirs after the gift is ended. (Co. Litt., 142*b*.) The residue of an estate left in the grantor, to commence in possession after the determination of some particular estate granted out by him. (2 Blackst. Comm., 175.) "A reversion is the return of land to the grantor and his heirs after the grant is over." (4 Kent's Comm., 353; 2 Bouv. Inst., 301.)

In the case at bar, the grant or gift to the Franklin Institute is over, by reason of its dissolution by the only court which had jurisdiction of the subject-matter and parties. And we submit, that for the purposes of this case, if not for all purposes, that adjudication is final and conclusive, and binding upon the courts of this State.

By the terms of the will, however, the plaintiffs seem to have a right superior to their reversionary right as defined by the elementary writers. We speak of that portion of the will which only grants the revenues of the land in controversy to the trustees.

It was "the revenues arising from my [his] plantations in Tennessee and Mississippi, and other common-law States," that were bequeathed to the trustees, thus leaving the fee in Franklin and his lawful heirs, unless it be contended and held that a mere usufructuary right, given for charitable or other purposes, would pass the fee to the land from which the revenues are to be derived.

We do not deny that there are authorities under which sale might be made of the fee, to make the bequest or dona-

tion available; but as no sale was ever made of this property by the trustees, it is scarcely necessary to further investigate that question.  It is enough for us to know, that the right of reversion vested in the heirs of Franklin at the times of his death, and that they have not disposed of it.

It is true, as the defendants say, that the will makes no provision for a reverter.  But "the reversion arises by operation of law, and not by deed or will; and it is a vested interest or estate, inasmuch as the person entitled to it has a fixed right of future enjoyment." (4 Kent's Comm., 354.)  The right here claimed on behalf of plaintiffs might, and perhaps would, not be a vested interest or estate, but for the fact that the fee is not passed to the institute, but is reserved in the donor or testator.  "The fee-simple of all lands must abide somewhere, and if he who has before possessed the whole carves out of it any particular estate, and grants it away, whatever is not so granted remains in him and his representatives."  (2 Bouv. Inst., 302.)

If correct in this position, as we think we are, then it follows that the statute of limitations cannot bar the recovery of the plaintiffs in this case, whatever the position of the Franklin Institute may be with reference to that branch of the case.  The question whether the statute of limitations can be made available as against the plaintiffs, "over the shoulders," as it were, of the Franklin Institute, will be discussed presently.   *   *   *

VI. The special findings of the jury, as submitted by the court, on its own motion, are inconsistent with the general verdict, and the special findings show that the general verdict for the defendants was improper, and not warranted by the facts as found.

[The special issues and verdict are set out in the opinion.]

Where a general verdict is rendered for plaintiffs, accompanied with special findings to interrogatories, which findings are inconsistent with any theory upon which the plaintiffs could recover, defendant is entitled to judgment *non obstante*

*veredicto.*    (Snyder *v.* Robinson, 9 Am. R., 738; 35 Ind., 311.)

In the case at bar, the special findings are thus inconsistent, and for that reason plaintiffs made their motion for judgment, notwithstanding the general verdict, which motion was overruled.    But if the special findings are not sufficiently inconsistent with the verdict, they are at least enough so to set aside the verdict.    And this, we submit, is what the court below should have done.

VII. [After discussing the testimony on the question of limitation, the argument continues:]

Upon the hypothesis, then, that the defendants are all claiming adversely, and can in nowise be regarded as tenants in common with the plaintiffs or with the Franklin Institute, as the case may be, we think we have shown that at least some of them fall far short of having complied with all the requirements to make the statute of five years available to them.

But were the defendants not tenants in common?

This court, in Bailey *v.* Trammell, 27 Tex., 328, says: " The possession of a co-tenant, or tenant in common, will be presumed to be in right of the common title.    He cannot claim the protection of the statute, unless it clearly appear that he repudiated the title of his co-tenant, and is holding adversely to it.    In such cases, the acts and declarations of the party in possession are to be construed much more strongly against him than when there is no privity of title."

See, also, Mosely *v.* Withie, 26 Tex., 720, where the court held that notice of the adverse claim must be brought home to the co-tenant.    In the case at bar, there could not have been such notice.

One of the cardinal rules is, that possession must be adversary, and it cannot be adversary unless it is hostile to the true title.    Said Marshall, C. J.: " To allow a different construction, would be to make the statute of limitations a statute for the encouragement of fraud,—a statute to enable one

man to steal the title of another, by professing to hold under it. No laws admit of such construction." (Kirk *v.* Smith, 9 Wheat., 241, 288 ; Tyler on Eject., 875.)

" In general, the possession of one tenant in common is the possession of the others, and the taking of the profits does not amount to an ouster of his companions." (2 Bouv. Inst., 314.)

Possession of one tenant in common is not adverse to his co-tenants until repudiation of the title by the occupant and notice brought home to the co-tenant. (Tyler on Eject.) And " one tenant in common may oust his co-tenant, and hold in severalty ; but a silent possession, accompanied with no act which can amount to an ouster, or give notice to his co-tenant that his possession is adverse, ought not to be construed into an adverse possession." (M'Clung *v.* Ross, 5 Wheat., 116. See, also, Clapp *v.* Bromagham, 9 Cow., 530 ; Ricard *v.* Williams, 7 Wheat., 59 ; Clymer *v.* Dawkins, 3 How., 674.)

Paschal certainly must be regarded as a tenant in common, in view of the authorities above cited. Barrow had purchased but a fourth interest from Cocke ; and when Paschal bought from Barrow, he took a quit-claim deed for the right, title, and interest of Barrow, which recites that his " said right, title, and interest " had been acquired by him from P. B. Cocke. His deed directly led him to the knowledge of the common interest of Isaac Franklin.

The position of the other defendants is scarcely better ; for while it has been held that an entrance under an entirety deed is adverse possession, that must be understood to mean, as we conceive, that the party so entering must do so innocently, in good faith. When, on the other hand, he has knowledge or notice of the common interest, and yet chooses to enter, having such knowledge or notice, he ceases to hold adversely, and becomes a tenant in common with those holding the outstanding interest.

" Purchasers are affected with constructive notice of all that

is apparent on the face of the title deeds under which they claim, and of such other facts as those deeds would put them on inquiry, and as such inquiry would bring to their knowledge. But of other extrinsic or collateral facts, constructive notice cannot be presumed, but must be proved." (2 Ab. N. Dig., 443.)

"The general rule of law is, that the recital of one deed in another binds the parties, and those who claim under them by matters subsequent. Technically speaking, such a recital operates as an estoppel, which works on the interest of the land, and binds parties and privies—privies in blood, privies in estate, and privies in law." (Crane *v.* The Lessee of Morris, 6 Peters, 611, quoted with approbation in Hardy *v.* De Leon, 5 Tex., 244.)

We have been thus discussing the defendants' claim, under the statute of limitations, with reference to the Franklin Institute. We did so for the reason that the plaintiffs are, in any event, the reversioners of the property in controversy; though we say further, that their reversionary interest attached at the death of Isaac Franklin. In fact, as we have before said, the fee to the property has been in the plaintiffs all the time, and that hence no statute of limitations has barred them, for the reason that their suit was instituted less than five years after any one of the defendants went into possession, and because the original plaintiff was a married woman, and the intervenors were minors at the time possession was taken.

If it should be held, however, that the fee to the land was not in the plaintiffs, then the reversion vested in them at the death of Isaac Franklin, and the effect is the same, to wit, that their rights could not be barred by the statute of limitations.

"It was decided, by Sir William Grant, in Leake *v.* Robinson, 2 Meriv., 363, that where there is no gift except by a direction to transfer an estate 'from and after' a given event, the vesting must be postponed until after that event has hap-

pened, unless from particular circumstances a contrary inten-
tion is to be collected.    And where the testator provides that
the devisees shall take a vested interest upon the happening
of a certain event, this is regarded as raising a sufficient
implication against their taking a present vested interest.'
(Redf. on Wills, part 2, 605.)

*S. G. Newton,* for defendants in error.—The authorities
cited by plaintiffs in error enunciate the law correctly, as to
the possession of one tenant in common being the possession
of the others; but there are exceptions to the rule, and one
of them is, that when the party in possession repudiates the
title of his co-tenant, and holds adversely to it, he will be en-
titled to claim the protection of the statute of limitations.
(Baily *v.* Trammell, 27 Tex., 317.)    In the case at bar, the
evidence is clear that Paschal took open and notorious pos-
session of the property under his deed, in opposition to the
claim of any and all persons whomsoever.    His acts, in hav-
ing the land surveyed into lots, building on a portion and
selling others, and public assertion of ownership, are all en-
tirely inconsistent with the idea of a co-tenancy, and under
the state of facts he was entitled to the protection of the five
years' statute of limitations.    In his case, however, he was by
deed the legal owner of one-fourth the property, and so enti-
tled to his possession, regardless of the statute of limitations,
so that the argument of counsel as to him is not applicable to
the case.

The only legitimate conclusions arrived at are these:

1st. That Franklin, in his lifetime, was the owner of one-
half the property in controversy.

2d. That he willed it to trustees, to be used for the benefit
of the Franklin Institute.

3d. That the fee to the land vested in them by reason of
the will.

4th. That before suit was brought on the part of the insti-
tute, defendants, and those under whom they claim, had peace-

able and quiet possession, under deeds duly recorded, using and enjoying the same, and paying taxes thereon for more than five years; and that thereby the plaintiffs, as well as the intervenors, are barred their right of action, and that the court did not err in overruling plaintiffs' motion for a new trial.

Gould, Associate Justice.—The history of this case, up to that stage of its progress, is to be found in the twenty-seventh volume of Texas Reports. After the case was remanded to the District Court, it was, without objection, consolidated with another action of trespass to try title for the same property, brought December 17, 1859, in the name of the Franklin Institute, by its trustees, Albert C. Franklin *et al.*, against F. L. Paschal and others.

On February 9, 1871, these trustees, having made known to the court that the Franklin Institute, a body corporate of the State of Tennessee, had been dissolved, and they, as trustees, discharged, but that the corporation was indebted to them in various sums, W. B. Leigh was appointed "receiver *ad litem*," to prosecute said suits for the benefit of said creditors. There was an amended petition, claiming that the property in controversy, and the entire estate of Isaac Franklin, was subject to the payment of a legacy of $100,000, left by the will of said Isaac to his widow, the plaintiff, Adelicia, now Adelicia Cheatham, alleging that the entire estate was inadequate to such payment; that a sale of the property in controversy, to pay said legacy, would involve useless expense and loss; and claiming that therefore "said Adelicia is the sole and lawful owner of said property, and that the same should be set aside for and decreed to her." The amended petition further alleges, that the Franklin Institute had ceased to exist, by the judgment of the courts of Tennessee; attaching, as an exhibit, a copy of a judgment and decree of the Supreme Court for the middle division of said State, in the case of William Franklin (trustee) and others *v.* John Armfield and others,

made in 1867, and winding up as follows: "And it appearing to the court that the Isaac Franklin Institute fails for want of funds, all the property and effects devised having been lost by the emancipation of slaves, the casualties of war, and the necessary expenses and the charges fixed thereon by the will of the testator, it is therefore further ordered, adjudged, and decreed, that the complainants, as trustees, be released from all further responsibility as such."

On exception of defendants, that part of the amended petition setting up the legacy was stricken out.

The pleadings of the defendants need not be stated, further than that the defense of limitations was fully set up; also the claim of improvements in good faith.

The plaintiffs, on the trial, claimed that the surviving children of Isaac Franklin, under whom they claimed, inherited the premises as forced heirs of said Isaac, notwithstanding his will. They further claimed, that if the will was valid to vest said premises in the Franklin Institute, that said incorporated body had been dissolved, and that thereupon the premises reverted to them, as the heirs of the donor.

The title of Isaac Franklin was under a deed from P. B. Cocke, of date in 1837, conveying the undivided half of the premises in controversy; which deed was recorded in Bexar county in 1844.

On March 22, 1839, P. B. Cocke conveyed to R. R. Barrow one-fourth part of the same premises, the deed reciting that the property conveyed is "land in the town of Bexar, which he owns conjointly with Isaac Franklin," and, after describing the premises, adds: "One undivided half of said tract of land was sold to the above-named Isaac Franklin, by the present vendor, by an act passed in this office the 5th of July, 1837. This fourth part of said tract of land is presently sold for the consideration of one hundred and twenty-five dollars, cash." This conveyance was recorded in Bexar county, on February 7, 1843.

In 1851, (the deed is blank as to the month in which it was

executed, but it was acknowledged May 6, and recorded in
Bexar county June 7, 1851,) R. R. Barrow executed a deed
to the defendant F. L. Paschal, the material parts of which,
after acknowledging the receipt of $600 as the consideration,
are as follows: "Have this day granted, bargained, sold, and
conveyed, and by these presents do grant, bargain, sell, and
convey, unto him, the said Franklin L. Paschal, his heirs and
assigns, all my right, title, and interest in and to a certain
lot, [describing the premises,] said right, title, and interest
having been heretofore acquired by me, of Pleasant Cocke, by
deed of mortgage and by deed of conveyance." (It is to be
remarked, that the conveyance by Cocke to Barrow contains
a recital that it was doubtful whether Barrow could legally
hold the land, not being a citizen of the Republic, and, to
provide against that difficulty, contains additional covenants
to secure the purchase-money paid by Barrow.) "To have
and to hold all my said right, title, and interest, whether the
same be legal or equitable, unto him, the said Franklin L.
Paschal, his heirs and assigns, to their own proper use, bene-
fit, and behoof, forever. And I do further stipulate and
covenant to and with the said Franklin L. Paschal, that I
have done nothing, and that I will hereafter do nothing, to
affect any interest which I have heretofore had in and to said
land; but I do not warrant beyond this; and the said Paschal
declares himself well satisfied with this limited warranty."
The other defendants claim portions of the premises under
recorded conveyances from Paschal, made at different periods
in 1852.

There was much evidence on the subject of improvements,
showing that the premises have been so improved as to be
now of great value. There was also evidence on the subject
of the possession of the different defendants, and the payment
of taxes. A printed book of over 900 pages, giving a history
of some of the litigation over the will of Isaac Franklin, the
proceedings had to carry out that will, including the act of
the Legislature of Tennessee incorporating the Franklin In-

stitute, and many other matters pertaining to said estate, is treated as in the evidence.

The court instructed the jury on the question of forced heirship, and that if the Franklin Institute had been incorporated, and had a legal existence, and, under the will, took title to the premises, that notwithstanding said incorporation were subsequently dissolved, and the title reverted to the heirs of Isaac Franklin, the defendants were entitled to the benefit of any defense, under the statute of limitations, which they had against the Franklin Institute at the time the suit in its name was commenced. The charge instructed the jury appropriately as to what was necessary to constitute adverse possession as between joint owners, and as to the general subject of limitation; but, under the five years' limitation, did not attempt to define or describe what would be a "deed or deeds duly registered," within the meaning of the statute.

The court also submitted some thirty special issues to the jury. They returned a general verdict, as follows: "We, the jury, find, from the evidence, that the property in controversy did not exceed one-fourth part of the estate of Isaac Franklin, and that the Franklin Institute is debarred by the statute of limitations, and, therefore, find for the defendants."

The special issues and the answers thereto were as follows:

1. Was Isaac Franklin the owner of one-half of the property described in the plaintiffs' petition? Answer. He was.

2. Did Isaac Franklin execute the instrument marked "A" as his last will and testament? A. He did.

3. When did he die? A. April 27, 1846.

4. What was the value of his estate at the time of his death, as shown by the inventory? A. Property in Louisiana, $513,294.63; property in Tennessee, $104,063.28; property in Mississippi, $58,400; property in Texas, $25,000;—total, $700,757.91.

5. Was Emma Franklin, at the time of her death, the sole surviving child of Isaac Franklin? A. She was.

6. When did she die?   A. November 1, 1855.

7. Was she at the time of her death a minor?   A. She was.

8. What was the relationship of the intervenors, Joseph H. and William H. Acklin, to the deceased, Emma Franklin? A. They were her half-brothers, having the same mother.

9. Were said intervenors minors at the date of Emma's death?   A. They were.

10. Were said intervenors minors on the 15th day of March, 1858, the date of their intervention in this suit?   A. They were.

11. What was the relationship of Mrs. Adelicia Cheatham to Emma Franklin, deceased?   A. She was her mother.

12. Was Mrs. Cheatham a married woman at the date of F. L. Paschal's purchase from R. R. Barrow?   A. She was then the wife of Joseph A. H. Acklin.

13. Do the deeds from Cocke to Barrow, and from Barrow to Paschal, show that Isaac Franklin was a part owner of the land in controversy?   A. The deed from Cocke to Barrow does show that Franklin was half owner, but that from Barrow to Paschal does not.

14. Does the deed to Barrow limit the amount of said lot conveyed to him by Cocke?   A. It does, to one-fourth.

15. Did Barrow convey to Paschal the same quantity of land sold to him by Cocke?   A. He did.

16. Was the portion sold to Paschal set apart and designated by metes and bounds, or was it an undivided portion of the same tract originally owned and sold by Casiano? A. It was originally a portion of the tract of land owned and sold by Casiano.

17. Did Paschal take possession of the whole tract, or of a part of the same?   If only a portion, then state which portion. A. He took possession of the whole tract.

18. Did Paschal take possession of the land in such manner and under such circumstances as to show that he openly and explicitly disavowed the title of Isaac Franklin, or those

claiming under him, and was such disavowal brought home to those having a common interest with him? A. He did take possession in such manner as to disavow the title of Isaac Franklin, or those claiming under him, and gave notice by having it surveyed and disposing of it under deeds recorded.

19. When did Paschal take possession of said land? A. In November, 1851.

20. What was the value of said undivided half of said land when Isaac Franklin died? A. Seven hundred dollars.

21. Was its worth or value less than one-fourth of the entire estate of said Franklin, as evidenced by the inventory of his estate? A. It was.

22. Was the Franklin Institute incorporated by the Legislature of the State of Tennessee? A. It was.

23. When was it incorporated? A. December 1, 1847.

24. Was the Franklin Institute organized, and when? A. It was organized March 15, 1850.

25. When was the Franklin Institute dissolved, and by what authority? A. By a decree of the Supreme Court of Tennessee, on the 28th day of March, A. D. 1867.

26. Was the suit No. 2777, now consolidated with this suit, commenced subsequent to the date of the organization of the Franklin Institute? A. It was.

27. Was said suit filed prior to the date of the dissolution of said institute? A. It was.

28. Was the land now in suit, and claimed by said institute, devised by the will of the said Isaac Franklin, deceased, to said Franklin Institute, in trust for charitable uses? A. It was.

29. Did any of those who purchased lots of said land from Paschal buy the same in good faith? Name them. A. They did not.

30. Did any of them purchase of Paschal in bad faith? Name them. A. They did.

Thereupon judgment was rendered in favor of defendants, quieting them in their possession and title; and that judg-

ment has been brought to this court by writ of error for revision.

1. Did the court err in sustaining the exceptions to that part of the petition setting up the legacy? It will be observed, that the unpaid legacy was alleged as a reason why the property sued for should be adjudged to the legatee, Mrs. Cheatham, and that there was nothing in the amended petition indicating that it was alleged with a view of having the property subjected to its payment. The action was trespass to try title; and the only prayer, besides a prayer for general relief, was that which is appropriate to that action. Certainly, if Mrs. Cheatham was entitled to an unpaid moneyed legacy out of the estate, that did not give her a title to the lands of the estate, nor a right to their possession. And even if she had sought the sale of the property for the payment of her legacy, it was not claimed that it constituted a charge on the lots in controversy, more than on any other property of the estate. Her remedy was not by claiming a lien on each distinct tract of land or piece of property belonging to the estate, but by seeking to enforce payment out of the entire estate. But how could she have the amount due her on her legacy adjudicated, or enforce its payment, in a suit against defendants who had no interest whatever in the estate? Certainly, to maintain a suit for that purpose, it would devolve on her to bring before the court all parties interested in the estate. Without inquiring as to whether she had any rights as legatee which could be asserted at the time this amendment was filed, we are very clear, that the court did not err in sustaining the exceptions to that part of the petition which was stricken out.

2. When this case was formerly before this court, it was held, that under the admissions of the parties the will was before the court as if properly probated, (and we understand this to mean probated in this State,) and the opinion was expressed, that to question its validity in this suit would be to attack the will in a collateral proceeding. We are satisfied

with these conclusions; and they render it unnecessary for us to scrutinize the charge of the court on the subject of forced heirs. (Anderson *v.* Stewart, 15 Tex., 289; Box *v.* Lawrence, 14 Tex., 545.) If the plaintiffs had any rights, on account of the forced heirship of the children of Isaac Franklin, under the statute on that subject then in force, those rights could only be asserted in some proceeding having for its object the setting aside of the will. It is said that the will was renounced by the last surviving child of Isaac Franklin; that the renunciation was approved by the courts of Louisiana; and, further, that by the judgment of the courts of that State, the legacy to the Franklin Institute was annulled. The action of the courts of another State in setting aside the will as to real estate and slaves in that State, because in violation of their statutes, was not designed to affect, and certainly could not affect, the validity of the will as to real estate in Texas, the will standing as having been probated here. (Acklin *v.* Franklin, 7 La. Ann., 395.)

3. It is claimed, that by the terms of the will the property did not vest in the Franklin Institute or its trustees. In the former consideration of the will, in this court, it was treated as a bequest to the two brothers of the testator, in trust for the charitable uses expressed. Indeed, such is the plain language and meaning of the instrument. Very plainly, by the terms of the will, the entire estate in Texas was conveyed and vested in these trustees; and there can be no pretense that it was the intention of the testator to leave the legal title in his heirs or widow. The latter, indeed, conveyed to said trustees "all her rights of dower and community and other rights in the property devised by her husband, Isaac Franklin, for the purpose of establishing an academy," &c. Whether, after the incorporation of those trustees, or, rather, of the only one who acted, as the Franklin Institute, the legal title is to be regarded as in the trustees or in the body corporate, does not seem to be material. The beneficial

ownership was in the incorporation, whether the legal title was or was not.

4. We think that the record must be regarded as showing that the Franklin Institute had ceased to exist as a body corporate. The trustees come into court and state the fact, and it is acted on by the court below. The courts of Tennessee adjudicated that the Franklin Institute has failed, for want of funds, and discharged the trustees from further responsibility. Under these circumstances, the courts of this State might well assume that the incorporation was dissolved. If so, it would seem to be the settled rule, that " its real estate reverts back to the original grantor and his heirs." (2 Kent's Comm., 307; Mayor and Commonalty of Colchester *v.* Seaber, 3 Burr., 1866; White *v.* Campbell, 3 Humph., 38.)

The plaintiff and her sons, the intervenors, being the heirs of the surviving children, and heirs at law of Isaac Franklin, were thus entitled to recover the interest of the estate in the premises sued for, unless prevented by the claims of the creditors of the Franklin Institute, represented by the receiver, or by some ground of defense established by the parties defendant.

As to the rights of those creditors, it is enough to say, that no evidence was adduced as to any indebtedness of the institute, and no issue on that subject was submitted to the jury.

5. But the jury found for the defendants, on the ground of limitations. Was that defense made out?

There can be no pretense that ten years' adverse possession was established. Indeed, the special verdict of the jury, fixing the commencement of Paschal's possession in November, 1851, shows that they could only have found on the ground that five years' adverse possession had been shown under a deed or deeds duly registered, and attended with the payment of taxes, use, &c., as prescribed by the statute.

We are clearly of the opinion, that the deed from Barrow to Paschal was not such a deed as the statute contemplates. It is not a deed to the land, but only to such right, title, and

interest as Barrow had before acquired from Cocke. That interest, we have seen, and the deed showing the fact was of record in Bexar county, was only one-fourth. Barrow's deed, then, does not purport to convey the land, but only an interest in it; and that interest, it appears from the conveyance referred to in the deed, was only one-fourth.

It has been said, that "the object of the statute in prescribing registry of the deed as necessary to enable the possessor to avail himself of the five years' limitation, is to give notice to the owners that the defendant in possession is claiming [the land] under the deed." (Kilpatrick *v.* Sisneros, 23 Tex., 136.) Evidently, a deed to an undivided interest will not, under the statute, protect the grantee beyond the interest it on its face purports to convey. Such a deed gives notice that the party in possession claims the undivided interest therein which the deed conveys, but is not notice that he claims the whole; yet such, in effect, is the deed under which Paschal claims. In Mitchell *v.* Burdett, speaking of this statute, it was said:

"It rests on the idea, that he who can show that he has thus notoriously claimed and used and borne the burden of property as his own, is most likely to be its true owner, although he may not be able to exhibit a regular chain of title from and under the government, and shall be taken to be the true owner. This was giving very great force to the presumptions arising from the usual incidents of ownership, and can only be accounted for, reasonably, on the ground that great importance and weight were attached to the concurrence of so many of the incidents of ownership as are specified in this section, to wit: a deed, registration of deed, possession of land, cultivation, use or enjoyment, payment of taxes; and these all continued in connection during the full period of five years. Each one of these incidents, then, becomes very important, in order to support the conclusive force of the whole." (22 Tex., 634.)

In pursuance of the idea of giving notice, it has been held

that a deed so uncertain or contradictory that it describes no land, is not the deed contemplated in the statute. The statute is one of great importance to the quieting of litigation; but, in our opinion, it would be to violate its object and meaning, to hold that the deed from Barrow to Paschal was such as in any wise conveyed notice that Paschal claimed the whole land, or was such a deed to the lots in controversy as would protect a party in possession under the limitation of five years. As to the defendant Paschal, the defense of limitation was not made out.

So as to defendant Fries: the evidence was insufficient as to that part of lots 2 and 3 which was conveyed to him by Kampmann in April, 1855. The evidence is, that Paschal conveyed lots 2 and 3 to Kampmann and Fries in May, 1852, and that in August, 1853, they, by deed of partition, divided the two lots between them, Fries taking the improved lot. During the time that the other, or unimproved lot, was owned by Kampmann, there is no evidence that there was any actual possession of that lot. It is only from the time that it was conveyed by him to Fries that the evidence shows such possession. Certainly, after the partition, Fries' possession was limited to the lot retained, and did not extend to that which he had parted with. (Cunningham *v.* Frandtzen, 26 Tex., 34.) The time after the conveyance to Fries, in April, 1855, up to the commencement of suit in the name of the Franklin Institute, was less than five years.

Again, as to some of the defendants, the evidence as to the payment of taxes was quite defective. The defendant Williams, as his evidence of payment of taxes, introduced a certificate which, as explained by the officer who gave it, was wholly insufficient to show that the taxes for five years had been paid.

As to some of the defendants, the evidence may have been sufficient to support the verdict; but as to the defendants Paschal and Williams, and in part as to defendant Fries, it was not sufficient. We have not deemed it necessary to pass

upon the question of its sufficiency as to each of the defendants separately. The defendants did not sever in their pleadings, nor on the trial. They went to trial together. The verdict was in favor of them all jointly, and the judgment followed the verdict. That judgment is an entirety, and if erroneous and reversed as to some of the defendants, it must follow that it be reversed as to all. The judgment is therefore reversed and the cause remanded.

REVERSED AND REMANDED.